2013 VT 53

## State of Vermont v. Asim Betts

[75 A.3d 629]

No. 11-371

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed August 2, 2013

214

*William H. Sorrell*, Attorney General, and *Evan P. Meenan*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General and *Robert Regan*, Legal Intern, Montpelier, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant Asim Betts was charged in June 2010 with felony possession of crack cocaine under 18 V.S.A. § 4231(a)(2) after the vehicle in which he was a passenger was stopped and he was transported to the police barracks. After the trial court denied a motion to suppress evidence and to dismiss the charges, defendant entered into a conditional plea agreement, reserving the right to appeal the trial court's suppression decision. Defendant argues that all evidence should have been suppressed under the Fourth Amendment to the United States Constitution and Article 11 of the Vermont Constitution because his consent to be taken to the police barracks for a strip search was invalid. We conclude that defendant's consent was obtained only in response to the threat of an unlawful warrantless arrest under both the Fourth Amendment and Article 11 and, therefore, reverse.

¶ 2. The facts may be summarized as follows.[1] On June 7, 2010, sometime after 10:16 a.m., a state trooper spoke with a confidential informant who said he had seen "White Steve," whom the trooper knew from previous investigations to be Steven McCauley, and an unknown black male "in possession of a large amount of crack cocaine." It was unclear how recently the informant had seen the men in possession of the drugs: According to the trooper's affidavit, the informant had seen the drugs at some point during the preceding twenty-four hours; the trooper later testified that the informant had seen the drugs more recently than that, some five hours before the stop. According to the trooper's testimony, the informant, whose identity was never revealed, "advised that . . . White Steve was driving around in a white Ford

---

[1] We draw the facts from the trial court's findings, testimony, and the dash-mounted-cruiser-camera video because we review a decision regarding the voluntariness of consent independently based upon the totality of the circumstances. *State v. Weisler*, 2011 VT 96, ¶ 26, 190 Vt. 344, 35 A.3d 970.

Explorer, and had an unknown African-American male subject in the vehicle with him, and that individual had a significant amount of crack cocaine on his person." The trooper testified that the informant, who had previously provided information that led to arrests and charges, did not provide any additional details regarding the quantity, packaging, or location of the drugs he purported to have seen.[2]

¶ 3. At about 11:30 a.m., while driving by on a public highway, the trooper spotted a white Ford Explorer at the location indicated by the informant and ran a license-plate check to verify it was McCauley's sport-utility vehicle. In doing so, the trooper learned that McCauley's license was suspended. The trooper did not stop the vehicle at that time but instead kept a "loose tail" for about two hours and forty-five minutes before pulling it over. The trooper confirmed that, during the lengthy period of time he observed the vehicle, he saw nothing that offered indicia of drug-related activity.

¶ 4. At the stop, the trooper first approached McCauley, who was driving; defendant occupied the passenger seat. The conversation was not recorded because the trooper was not wearing a functioning microphone. The trooper testified that he told McCauley that he was under suspension, did not have a front license plate, and that the trooper had received information about crack in the car. Several minutes after the initial stop, another officer arrived. From what can be discerned from the dashboard camera mounted in the trooper's cruiser, the other officer walked toward the Explorer's passenger side. Meanwhile, McCauley got out of the vehicle and continued to speak with the trooper. Both appeared from the cruiser video to be standing within earshot of the Explorer, where defendant remained seated, although, again the content of the conversation was not recorded.

¶ 5. Describing his interaction with McCauley, the trooper testified during the suppression hearing: "I explained to him the information that I had, and that I would be asking for consent [to search], and if not I was prepared to seize their persons and the vehicle to apply for a warrant." In response to questioning, the trooper said he told the men that "they both would be seized, as

---

[2] The trooper could not confirm whether the informant's tips had led to convictions, a consideration that some courts have found relevant in assessing credibility. Because of the disposition of this case on other grounds, we decline to address the effect, if any, this might have on a credibility determination.

would the vehicle." The trooper in his testimony agreed that the men would be handcuffed while the trooper made contact with a judge and waited for the judge to review the warrant application. The trooper said: "I didn't explain it all in detail and that depth to them, but I told them that they would be seized, as would the vehicle, go to the barracks, and apply for a warrant."

¶ 6. At some point during the conversation, McCauley told the trooper that he "was crazy, and that there was no drugs in the car or on their person" and agreed then to consent to a car and body search, according to the trooper's testimony. The trooper left McCauley with another officer to fill out a consent-to-search form and spoke with defendant, who remained in the Explorer. In his testimony during the first day of the suppression hearing, the trooper described the conversation as follows:

> [Trooper]: I told him if the consent was denied, that these were the options that we had, and I was asking for a consent, and I explained to him the information that I had received, and that I had validated the information, *that I would be seizing their persons* and the vehicle, yes.

> [Question]: And that information was conveyed to Mr. Betts before he gave the verbal consent at the car to go ahead and search his person.

> [Trooper]: Yes.

¶ 7. The suppression hearing recessed, and after a lengthy hiatus, began anew some weeks later. The trooper then testified that he merely explained the options to Betts after he had already given consent, stating "I don't recall the search warrant. I did explain to him, like I said, the information obtained from the informant, and he immediately said that he was not in possession, there was no crack in the vehicle, and I could search his person."

¶ 8. Defendant similarly described the critical portions of his initial encounter with the trooper, testifying that the trooper told him "if you don't consent, then we'll put you in cuffs, and we'll bring you to the barracks, and then we'll get a warrant." Regardless of the specific content of their conversation, the trial court in its decision found that, at a minimum, the trooper "explained that if consent was not given, *he would seize them and would be applying for a search warrant.*"

¶ 9. The trooper brought defendant back to his cruiser to fill out paperwork to consent to a body search. Before entering the cruiser, defendant agreed to empty his pockets. The pocket-dump revealed nothing drug related, and defendant was allowed to place everything back in his pants. Once inside the cruiser, where the recorder was operating, the trooper explained what defendant would be consenting to. In particular, the trooper told defendant that they would go to the barracks because a strip search could not be conducted in the public parking lot and that defendant would be handcuffed during the trip to preserve any evidence. The trooper read the consent form to defendant and noted that although he believed he had probable cause, a judge would need to approve a warrant if defendant did not consent. The trooper handed defendant the consent form and asked him to sign, which he did.

¶ 10. The trooper placed defendant in handcuffs, drove him to the barracks, and left defendant inside before returning to his cruiser to retrieve the dash video. As the trooper approached his cruiser, he saw what later proved to be crack cocaine on the ground beside the passenger door. The trooper went back inside and read defendant his *Miranda* warning. Defendant waived his rights by signing a form, and then acknowledged that the crack was his and that he had come from Connecticut to purchase it.

¶ 11. Defendant moved to suppress the evidence and dismiss the charges, alleging that his consent was not voluntary. The trial court denied the motions after determining that the alleged motor-vehicle violations justified the initial stop and that defendant voluntarily consented to a search, which necessitated a trip to the police station. The trial court concluded that "the observed motor vehicle code violation provided an objectively reasonable basis for the initial stop" and that "the immediate request for a consent to search did not impermissibly expand the duration of the stop." In analyzing the circumstances surrounding defendant's purported consent, the trial court focused exclusively on the recorded interaction between defendant and the trooper inside the patrol car, at which time the trooper "asserted his opinion that he would be able to obtain a warrant" but "qualified that statement by indicating that a judge would have to agree with him that probable cause existed." The court omitted any discussion of its own finding that the officer had threatened to "seize" defendant pending a warrant application.

¶ 12. Defendant appeals, arguing that the trial court erred in failing to suppress the evidence because defendant's transportation to the police barracks was unsupported by either a valid consent to the search that necessitated the trip or by probable cause. We reverse.

I.

¶ 13. Absent voluntary consent, defendant's transportation to the police barracks in handcuffs for a full-body strip search would undoubtedly constitute an arrest, rather than a mere investigative detention. See *State v. Pitts*, 2009 VT 51, ¶ 7, 186 Vt. 71, 978 A.2d 14 ("A full-scale arrest or the functional equivalent (i.e., where the level of restraint has become too intrusive to be classified as an investigative detention) requires the highest level of justification — probable cause." (quotations omitted)); see also *Hayes v. Florida*, 470 U.S. 811 (1985) (transporting to police station absent probable cause or valid consent violates Fourth Amendment).[3] The State argues that defendant provided voluntary consent to be transported to the barracks for a strip search, obviating any need to establish probable cause to justify an arrest or an exception to the warrant requirement.

¶ 14. "[A] trial court's decision on the question of the voluntariness of a consent to search, and thus the ultimate constitutional validity of the search, must be reviewed independently by this Court on appeal." *State v. Weisler*, 2011 VT 96, ¶ 26. Our inquiry focuses "on whether a reasonable person in the defendant's circumstances would have retained the freedom of will to withhold consent." *Id.* ¶ 33. "Voluntariness is to be determined from the totality of the circumstances, with the State carrying the burden of demonstrating that the consent was freely given and not coerced by threats or force, or granted only in submission to a claim of lawful authority." *Pitts*, 2009 VT 51, ¶ 24 (quotation omitted).

¶ 15. We have previously held that consent obtained during an illegal detention is invalid, although this appears to be the first time we have addressed the voluntariness of consent given when

---

[3] Transportation to a police station without consent is no less an arrest simply because it is necessitated by the police's purported desire to protect a suspect's dignity and privacy by conducting a strip search away from the public eye.

a police officer threatens a detention amounting to an arrest.[4] See *Pitts*, 2009 VT 51, ¶ 20 ("The detention was plainly invalid . . . [and] the illegal detention irremediably tainted the consensual search of [defendant's] person which immediately followed."); *State v. Sprague*, 2003 VT 20, ¶ 31, 175 Vt. 123, 824 A.2d 539 (defendant's consents for search of person, vehicle, and home following an illegal seizure were "tainted and ineffective"); see also *Florida v. Royer*, 460 U.S. 491, 507-08 (1983) (consent to search luggage tainted by illegal detention).

¶ 16. In *Pitts*, we concluded that police lacked reasonable suspicion to temporarily detain and pointedly question a man about drugs, holding that the defendant "would have concluded that he was the subject of a focused police investigation into criminal activity and was not free to disregard the officers' questions and requests." 2009 VT 51, ¶ 14. On that basis, we concluded that the defendant's ultimate consent to a search was invalid. We observed:

> While the record reveals neither physical restraint nor blatantly aggressive or intimidating language, these circumstances — including the fact that the suspect was obviously followed for a substantial distance, that his taxi was searched, and that he was successively questioned about weapons and drugs — are precisely the kind which courts have characterized as a particularized inquiry into criminal activity which the average person would not have felt free to disregard or terminate.

*Id.* ¶ 16. In arriving at that conclusion, we acknowledged the criticism engendered by many U.S. Supreme Court decisions that seemingly overestimate the average person's capacity to decline police requests or end police questioning. *Id.* ¶ 17.

▮ ▮ ¶ 17. It is also well established that consent is not voluntary when it is a mere submission to a claim of lawful authority. See *Bumper v. North Carolina*, 391 U.S. 543 (1968). In *Bumper*, the Supreme Court held that the government's burden to prove voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Id.* at

---

[4] We assume without deciding that defendant's initial detention, arguably a mere byproduct of the physical impediment to his departure posed by his presence as a passenger in a vehicle stopped for illegal operation, was not illegal.

548-49. In that case, police possessed a warrant to search a house, but the warrant was never returned, requiring the state to proceed on a theory of consent. The outcome of the case would, however, have been the same even if the warrant had been returned. See 4 W. LaFave, Search and Seizure § 8.2(a), at 72-73 (5th ed. 2012) ("[T]he Court made it unmistakably clear that the same result would be reached if the warrant was thereafter relied upon and held invalid or insufficient, or if the police falsely claimed to have a warrant."). A claim of lawful authority invalidating consent need not involve mention of a warrant.

> It is enough . . . that the police incorrectly assert that they have a right to make a warrantless search under the then existing circumstances, or circumstances they could cause to occur; that they claim that absent such consent they will detain defendant while a non-search alternative is used to acquire the information sought; . . . or that the police have misrepresented the existence of certain facts . . . which, if they actually existed, would allow the police to make a warrantless search.

*Id.* at 76-77 (citing *United States v. Morgan*, 270 F.3d 625 (8th Cir. 2001). In *Morgan*, the United States Court of Appeals for the Eighth Circuit held that a woman did not voluntarily consent to a search when she acquiesced after police said they would conduct a dog sniff if she did not submit. 270 F.3d at 632 (court nevertheless finds no Fourth Amendment violation because further detention was only ten minutes and thus did not require reasonable suspicion). It is for these reasons that we have refused to find voluntary consent when authorities portrayed the warrant requirement as a mere formality and its issuance a certainty, although, in and of themselves, "statements indicating an intent by the police to apply for a warrant merely describe what will occur in the event of a refusal." *Weisler*, 2011 VT 96, ¶ 38 (quotation marks omitted).

■ ¶ 18. For similar reasons, consent for a search is not voluntary when obtained in response to the threat of an unlawful detention. See, e.g., *United States. v. Jefferson*, 650 F.2d 854, 858 (6th Cir. 1981). In *Jefferson*, the United States Court of Appeals for the Sixth Circuit observed:

> We also reject the government's contention that [defendant] consented to the search. Although [defendant]

told [the officer] to "go ahead" and search his luggage, *he did so only after he was threatened with illegal detention. . . .*

In this case, [the defendant] was not simply asked if he would consent to a search; he was hauled off the street and into a private office and told that if he did not consent to a search he would be held until [the officer] obtained a search warrant. In view of the fact that [the defendant] was threatened with being detained, although [the officer] had no right to hold him, his consent cannot be considered voluntary. It was obtained under duress; the alleged consent does not vitiate the illegality of the arrest.

*Id.* at 858.

¶ 19. We are faced with a similar situation here. First, defendant agreed to a search only after the trooper explicitly told him that both he and McCauley would be "seized" and taken to the police barracks to await a warrant. Second, the trooper, in fact, lacked the authority to transport defendant to the barracks against his will because neither the informant's tip nor the trooper's lengthy surveillance or later interaction with defendant provided probable cause.[5] Probable cause for a "warrantless arrest exists when the facts and circumstances known to an officer are sufficient to lead a reasonable person to believe that a crime was committed and that the suspect committed it." *State v. Arrington,* 2010 VT 87, ¶ 11, 188 Vt. 460, 8 A.3d 483 (quotation omitted). Probable cause must be based on the knowledge available to the

___

[5] The motor-vehicle infraction committed by the driver cannot be relied upon to support probable cause to arrest or search defendant, who was a passenger. An officer's knowledge that someone is operating a vehicle with a suspended license justifies stopping the vehicle, but only for as long as necessary to "effectuate the purpose of the stop." *State v. Cunningham,* 2008 VT 43, ¶ 17, 183 Vt. 401, 954 A.2d 1290 (quotation omitted). That is to say, "the officers may briefly detain the individual to investigate the circumstances that gave rise to the suspicion, while ensuring that the detention is 'reasonably related in scope' to the circumstances that justified it." *Pitts,* 2009 VT 51, ¶ 7 (quoting *Terry v. Ohio,* 392 U.S. 1, 29 (1968)); see also *Sprague,* 2003 VT 20, ¶ 17 (noting "requirement that the police intrusion proceed no further than necessary to effectuate the purpose of the stop"). Defendant, however, was a passenger and thus clearly did not commit the motor-vehicle violation justifying the stop. Nor could it be fairly suggested that his detention and questioning would yield any evidence related to that infraction.

officer at the time, and not based on any evidence uncovered later. *State v. Phillips*, 140 Vt. 210, 216, 436 A.2d 746, 750 (1981) (probable cause for warrantless arrest based on "the information possessed by the police at the time of initial detention"). A finding of probable cause must be based on "substantial evidence." *State v. McManis*, 2010 VT·63, ¶ 5, 188 Vt. 187, 5 A.3d 890 (quotation omitted).

¶ 20. This Court applies a two-prong test codified by Vermont Rule of Criminal Procedure 41 to evaluate whether probable cause for a warrant exists based on the hearsay testimony of a confidential informant not named by the police. See *Arrington*, 2010 VT 87, ¶ 12. We apply the same *Aguilar-Spinelli*[6] test to probable-cause-to-search determinations. See *McManis*, 2010 VT 63, ¶ 19. The first prong examines the basis for an informant's knowledge; the second concerns whether an informant's tip is, in fact, credible. See *Arrington*, 2010 VT 87, ¶¶ 13-14. An informant's first-hand knowledge satisfies the first prong, which is concerned exclusively with the factual basis of that knowledge. To satisfy the second prong, the informant must be inherently credible or the information must be reliable on that particular occasion. *Id.* Reliability on a particular occasion requires "a showing that the informant's tip was ·against penal interest or that the information was corroborated by police to the point where it would be reasonable for them to rely on it as accurate." *McManis*, 2010 VT 63, ¶ 12 (quotation omitted).

¶ 21. Here, assuming the informant personally saw White Steve and "an unknown black male in possession of a large amount of crack cocaine," the first prong might arguably be satisfied — at least with respect to White Steve and this "unknown black male" — based upon the informant's direct observation of an individual who was known to the officer and another described only very broadly as a male who was black.[7]

---

[6] The test is based on two United States Supreme Court cases, *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969). We continue to employ this test although the U.S. Supreme Court has since abandoned it.

[7] The affidavit is not clear on this point because it omits a word. The affidavit reads "CI advised that within the last twenty four hours, s/he had [missing past participle] Steve Mcauley and an unknown black male." From the trooper's testimony, however, it appears that the informant claimed to have seen the drugs.

¶ 22. The second prong addressing informants' inherent credibility or the reliability of their information on a given occasion would not, however, have been satisfied. A reviewing court would not have been able to independently evaluate the informant's inherent credibility on the basis of the information contained in the affidavit or the trooper's testimony. See *McManis*, 2010 VT 63, ¶ 11 (facts and circumstances surrounding officer's determination that an informant is inherently credible must be sufficient to permit independent assessment of that conclusion). Evidence that an informant "has provided accurate information in the past" may sometimes establish an informant's "[i]nherent credibility." *Id.* (quotation omitted). But "conclusory affidavits present the spect[er] — offensive to constitutional guarantees — that the inferences from the facts which lead to the complaint will be drawn not by a neutral and detached magistrate . . . but instead by a police officer engaged in the often competitive enterprise of ferreting out crime." *State v. Robinson*, 2009 VT 1, ¶ 12, 185 Vt. 232, 969 A.2d 127 (quotations omitted).

¶ 23. Here, the trooper's affidavit indicated that the confidential informant had "provided . . . information in the past that has led to the arrest of at least three separate individuals for various narcotics offenses." While a closer call than some of our other cases to weigh the credibility of an unnamed informant, the context falls short of that required to permit an independent analysis of the informant's credibility. Past information leading to other drug-related arrests is certainly a factor that weighs in favor of concluding an informant is credible. See *Robinson*, 2009 VT 1, ¶ 9 (finding insufficient affidavit of probable cause to search where officer "affirmed that the informant's past information had 'concerned' illegal activities, but did not aver that the information had led to convictions, *arrests*, evidence, or even search warrants" (emphasis added)). The touchstone of our analysis in *Robinson*, however, was not the mere absence of a formulaic recitation that arrests had resulted from information provided. Rather the case turned on the insufficiency of evidence that would allow a "judge independently to draw the inference that the informant was credible." *Id.* ¶ 14. Indeed, in *Robinson*, we quoted approvingly *United States v. Acosta*, 501 F.2d 1330, 1332 (5th Cir. 1974), which held insufficient a probable-cause affidavit that said "nothing about whether the cases thus initiated were successfully prosecuted, whether they were based on information supplied by the infor-

mant, or if so, whether the information proved to be accurate."
2009 VT 1, ¶ 13 (quotation omitted).

¶ 24. The trooper's affidavit here contains no indication as to the actual nature of the informant's cooperation or information in the past, how the information "led" to the alleged arrests, or the final outcome of any of the cases in which he or she was involved. See *Commonwealth v. Santana*, 583 N.E.2d 1288, 1291 (Mass. 1992) (" 'The affidavit does not make clear what role the informant played in obtaining the arrest.' " (quoting *Commonwealth v. Rojas*, 531 N.E.2d 255, 257 (Mass. 1988))); *Commonwealth v. Mejia*, 579 N.E.2d 156, 156 (Mass. 1991) (fact that informant provided information leading to three arrests did not establish reliability under *Aguilar-Spinelli* test). On this record, a reviewing court would simply have no basis upon which to discharge its constitutional duty to independently analyze the informant's credibility.

¶ 25. Nor can we conclude that the information provided was necessarily reliable on this particular occasion. There is no indication that the informant made statements against his or her penal interest, and, thus, the State would need to establish that the "information was corroborated by police to the point where it would be reasonable for them to rely on it as accurate." *McManis*, 2010 VT 63, ¶ 12 (quotation omitted).

¶ 26. In *Arrington*, we held that probable cause existed for a warrantless arrest predicated on information provided by an informant whose tip was deemed reliable on the basis of several important factors notably absent in this case: First, the informant in *Arrington* had marked money and drug paraphernalia that implicated her in the retail drug trade about which she purported to provide information. 2010 VT 87, ¶ 15. Second, the informant offered not only predictive information about the defendant's movements and vehicle, adding validity to the remainder of her claims, but also personally accompanied police to identify him. *Id.* ¶¶ 17-18. Third, the informant's identity was known not only to police but to the court and the defendant, as well, exposing her to retaliation for her statements, which she made under oath and its attendant threat of perjury charges. *Id.* ¶ 19. Fourth, the informant in *Arrington* made statements implicating her in a crime.

¶ 27. The informant's information in this case falls far short of that standard. As an initial matter, the informant's information consisted largely of the sort of "mere innocent details" that we

have previously held insufficient by themselves to confirm allegations of criminal conduct even under the more forgiving standard of reasonable suspicion. See *Robinson*, 2009 VT 1, ¶ 15 (confirmation of innocuous details does not bolster credibility of assertion regarding illegal conduct). In *Robinson*, a confidential informant told police "that a twenty-six-year-old black male named 'Naim' would be driving to Vermont from Pennsylvania with cocaine in his vehicle." *Id.* ¶ 2. The tipster's information included the age, name, race, and origin of the eventual defendant; allegations of a specific crime; the make and model of the defendant's car, as well as the issuing state for its license plate; and a highly specific description of the subject's route into Vermont. We acknowledged that "predictive information could, in a different case, provide such a wealth of detail about future behavior as to be effectively self-verifying" but concluded that the information corroborated must confirm more than peripheral, innocent details. *Id.* ¶¶ 15-16. That is to say, the information corroborated must relate in some way to the criminal activity alleged. *Id.* ¶ 16; see also *McManis*, 2010 VT 63, ¶ 15 ("[T]he deputy sheriff's drive-by of defendant's house and DMV records check revealed no evidence of any criminal conduct and therefore 'did nothing' to corroborate the criminal conduct alleged by the CI.").

¶ 28. Here, the State suggests that the informant's tip accurately predicted that defendant would be in the company of White Steve, who was known to police from other investigations, and that the car they occupied would be at a particular location. According to the State, such information would not be available to the general public observer and therefore would be sufficient to justify at least the lower standard of reasonable suspicion. We find this contention without merit. As the trooper himself acknowledged, he first observed White Steve's car from a public highway after speaking with the informant. The trooper's verification of the make, model, and publicly observable location of McCauley's car, which would have been evident to anyone passing by, concerns precisely the type of innocent details we have previously concluded were insufficient to corroborate the reliability of an informant's tip or, indeed, to generate probable cause. See *McManis*, 2010 VT 63, ¶ 15 ("We reaffirmed in *Robinson* that [*State v. Goldberg*, 2005 VT 41, ¶ 14, 178 Vt. 96, 872 A.2d 378),] stood for the proposition that 'the corroboration of mere innocent details did not prove that the informant's allegations of drug offenses

were reliable.' " (omission indicated)). The trooper acknowledged that during several hours of loosely tailing McCauley and defendant, he observed nothing suspicious that would independently corroborate allegations of criminal, drug-related conduct. In fact, the trooper did not even discover anything drug-related when he asked defendant to empty his pockets before placing him in the cruiser.

¶ 29. Moreover the informant's tip in this case offered no details that directly related to defendant. Rather, the tip described an "unknown black male," who, according to the trooper's affidavit, had been in the company of White Steve and a large amount of cocaine within twenty-four hours of the informant's conversation with the trooper; the trooper later narrowed that period to several hours before the call. Regardless of the time that transpired, nothing more than gender and race suggested that the person in McCauley's car at the time of the stop was the same one whom the informant purported to have seen earlier in possession of drugs. This is in marked contrast to the situation in *Arrington*, in which the informant personally identified the suspect while accompanying the police, 2010 VT 87, ¶ 4, or in *Robinson*, in which case the informant identified the defendant not merely by description but by name, 2009 VT 1, ¶ 2.

¶ 30. We find similarly unpersuasive in this case the State's correct observation that law enforcement officers may at times rely on "personal knowledge of [a] defendant's prior criminal activity" to assess the reliability of an informant's tip. *State v. Lamb*, 168 Vt. 194, 198-99, 720 A.2d 1101, 1104 (1998). In this case, the trooper had absolutely no knowledge of defendant's history — criminal or otherwise — because informant described only an "unknown black male" and the trooper had no previous experience with defendant. Indeed, on the basis of this vague tip, any black man who happened to suffer the misfortune of traveling with White Steve on that particular occasion might have been subjected to the threat of unfounded detention. Even assuming that defendant's detention as part of an investigatory stop was supported by reasonable suspicion, a conclusion that we do not reach, the informant's tip in this case simply cannot be viewed as establishing the probable cause that would be necessary to search defendant or to transport him to the police barracks absent voluntary consent. Nor does the State argue that it did. Defendant's "consent," then, was not so much a submission to a claim of

lawful authority to perform the requested act, as it was a submission to an implied claim of authority to carry out what we conclude would be an illegal arrest as a predicate to attempting to obtain a warrant. See *Jefferson*, 650 F.2d at 858; see also *United States v. Ocheltree*, 622 F.2d 992 (9th Cir. 1980).

¶ 31. The State appears to contend that police may arrest suspects without probable cause in order to preserve possible evidence while they apply for search warrants that might enable them to discover the very evidence that would provide probable cause. Given the facts of this case, the law precludes this rather circular assertion of authority. Under the Vermont and Federal Constitutions, a person cannot be unlawfully arrested to be "at the disposal of the authorities while a case is discovered against him." *In re Davis*, 126 Vt. 142, 143, 224 A.2d 905, 906 (1966); cf. *United States v. Ponce*, 947 F.2d 646, 651 (2d Cir. 1991) ("[O]ur holding should not be read as sanctioning police conduct intended to hold a suspect or a car without probable cause while the police attempt to gather additional information. Such conduct would be a clear violation of the Fourth Amendment. We hold only that *if the police have probable cause* to search a car, they may hold that car for a reasonable time while they obtain a search warrant based on facts known to them prior to the initial seizure." (citation omitted and emphasis added)). As with any arrest, therefore, a warrantless arrest must be supported by probable cause. See *Phillips*, 140 Vt. at 216, 436 A.2d at 750 ("The standards for evaluating the factual basis supporting a probable cause assessment are not less stringent in a warrantless arrest situation than in a case where a warrant is sought from a judicial officer."). If, upon later review, an officer is found not to have had probable cause, the arrest is unlawful. The State's argument appears to rely on the flawed premise that a judge's determination somehow operates to manufacture probable cause. That is not the case. An officer either possesses that level of suspicion at the time of the encounter or he does not. A judge must later review that determination to verify the existence of the appropriate standard. But the existence or absence of that level of suspicion depends entirely on the information possessed by the arresting officer at the time. See *id.* (probable cause for warrantless arrest based on "the information possessed by the police at the time of initial detention").

¶ 32. Nor do we find compelling the State's attempt to employ here narrow exceptions to the search warrant requirement as a basis for a person's arrest — or the threat of one — without probable cause. Among other salient distinctions, these exceptions themselves require probable cause as a necessary predicate in addition to the claimed exigent circumstances. See, e.g., *State v. Girouard*, 135 Vt. 123, 129, 373 A.2d 836, 840 (1977) ("The well-delineated preconditions to [the automobile exception's] reasonable invocation are 1) *probable cause* to believe that the vehicle contains evidence of crime and 2) exigent circumstances." (quotation omitted, emphasis added)). As we have observed, the officer in this case did not have probable cause to believe that the vehicle contained evidence of a crime.

## II.

¶ 33. Having determined that defendant's consent to a strip search was not voluntary and was, therefore, invalid, we conclude that the trial court erred in declining to suppress the evidence obtained from the ground outside the station. "Evidence obtained in violation of the Vermont Constitution, or as a result of a violation, cannot be admitted at trial as a matter of state law." *State v. Oakes*, 157 Vt. 171, 173, 598 A.2d 119, 121. (1991) (quotation omitted). Unless the taint of illegality has dissipated, evidence must be suppressed. *State v. Barron*, 2011 VT 2, ¶ 24, 189 Vt. 193, 16 A.3d 620. The question in these cases is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Phillips*, 140 Vt. at 218, 436 A.2d at 751 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). In this case, the evidence was discovered on the ground outside the cruiser after defendant had been taken to the barracks for his allegedly consensual search. Defendant's presence at the barracks resulted directly from his invalidly obtained consent. Similarly, his confession to possessing the drugs flowed directly from the discovery of that illegally obtained evidence. Cf. *State v. Hunt*, 150 Vt. 483, 555 A.2d 369 (1988) (evidence did *not* show that *but for* illegal search and seizure defendant would *not* have confessed to murder and therefore confession was not fruit of illegal search). We therefore agree with defendant that this evidence should have been suppressed. See *State v. Badger*, 141

Vt. 430, 453, 450 A.2d 336, 349 (1982) (establishing that there is no good-faith exception to Vermont's exclusionary rule and noting that admission of improperly obtained evidence "eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct"); see also *McManis*, 2010 VT 63, ¶ 19 (exclusionary rule " 'encourages police to diligently corroborate information from a potentially unreliable source' " (quoting *Robinson*, 2009 VT 1, ¶ 19)). Absent the evidence obtained after defendant's transportation to the barracks, a conviction cannot be upheld, and consequently the trial court also should have granted defendant's motion to dismiss.

*Reversed; defendant's motion to suppress and dismiss is granted.*