NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 19

No. 2014-347

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| Shamel L. Alexander | October Term, 2015 |

Nancy Corsones, J.

Robert F. Plunkett, Bennington County Deputy State's Attorney, Bennington, for
 Plaintiff-Appellee.

Matthew F. Valerio, Defender General, Anna Saxman, Deputy Defender General, and
 Bridget Denzer, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

Robert Appel, Burlington, for Amicus Curiae Vermonters for Criminal Justice Reform.

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.     **ROBINSON, J.**     Defendant Shamel L. Alexander appeals from his conviction for trafficking heroin in violation of 18 V.S.A. § 4233(c).  He argues that the trial court erred when it denied his motion to suppress evidence obtained as a result of an unlawful seizure that was not supported by reasonable suspicion.  We agree and reverse.

¶ 2.     The trial court made the following findings in connection with defendant's motion to suppress.  On July 11, 2013, Detective Urbanowicz of the Bennington Police Department (BPD) was driving an unmarked police vehicle in Bennington when a taxicab pulled up next to him on his right side and the driver motioned for him to roll down his window.  When he did so, the cab driver asked Detective Urbanowicz for the location of the "China Buffet."  There is no

Chinese restaurant in Bennington called China Buffet. Detective Urbanowicz noted that according to the information displayed on the cab, it haled from Albany, New York. On the basis of his work with the Southern Vermont Drug Task Force, the detective was aware of information that heroin and crack cocaine dealers from out of state were using cabs and buses to travel to Bennington to distribute drugs. Specifically, he was aware that the Yankee Trails bus stop, located next to a Chinese restaurant on Main Street in Bennington that had always been called the Lucky Dragon, was a place where both controlled and street drug transactions had occurred.

¶ 3. Detective Urbanowicz was aware that the task force had developed information that a large African American male, with the nickname "Sizzle," traveled to Bennington in the company of a woman named Danielle and a man named Tracy, both known to Detective Urbanowicz to deal drugs.[1] Detective Urbanowicz noticed a large African American male sitting in the front passenger seat of the cab and thought he might be "Sizzle," though he was not certain.

¶ 4. Coincidentally, Corporal Hunt, also of the BPD, drove by in uniform and in a marked police cruiser. Detective Urbanowicz mentioned to Corporal Hunt through the window that the cab "would be a good stop if you could find him doing something wrong." Corporal Hunt was aware of the same information as Detective Urbanowicz relating to drug investigations in Bennington and was aware of "Sizzle's" general description.

---

[1] The trial court did not make a finding about the mode of transport Sizzle was believed to use to travel to Bennington, but Detective Urbanowicz testified that it was his understanding based on confidential informants and anonymous tips that Sizzle used taxicabs and public transportation to get into town.

Detective Urbanowicz testified that police knew Sizzle was coming to Bennington with a known female by the name of Danielle. He linked Danielle to the man named Tracy, but did not testify that Sizzle was known to come to town with Tracy. This discrepancy between the trial court's finding and the evidence does not significantly affect our analysis.

¶ 5.    Corporal Hunt saw that the cab had a GPS device attached to the interior of the front windshield and stopped the cab for violating 23 V.S.A. § 1125, which prohibits driving with an obstructed windshield.  The cab driver identified himself as the owner and operator of the cab, and provided his license, registration, and proof of insurance.  The passenger identified himself as Shamel L. Alexander, gave his date of birth, and indicated that he was from Brooklyn, New York.  He said he was going to the Chinese restaurant.

¶ 6.    Corporal Hunt ran records checks on both the driver and passenger and saw that there were no warrants for either.  The record check also revealed Alexander had a prior misdemeanor arrest from Dover, Vermont in 2010, had an alias: "Snacks," and had a listed address in New York.

¶ 7.    At that point, Corporal Hunt asked the driver to step out of the cab so he could discuss the situation with the driver.  Corporal Hunt proceeded to ask the driver questions about defendant and the circumstances of his ride to Bennington.  The driver revealed that Alexander had been driven to Bennington several times by different cab drivers in the past, is generally picked up at the bus station in Albany, and did not have a specific address for his destination but wanted to be taken to the "Chinese Buffet" on Main Street.  After this discussion, Corporal Hunt asked the driver for permission to search the cab.

¶ 8.    Corporal Hunt then approached Alexander, who told Hunt that he had family in Bennington and listed several people with the last name of Alexander.  Corporal Hunt, who has lived in the community for a number of years, did not recognize the names.  Defendant told Corporal Hunt that he was going to meet his grandmother on School Street.  Corporal Hunt is familiar with many of the families on School Street and knew of no older woman with the last name of Alexander who lived on School Street.  Corporal Hunt opined that it was odd that defendant would go to a restaurant a short distance from his grandmother's house before going to

3

her home. Defendant responded that he actually lived in Bennington, further arousing Corporal Hunt's suspicions.

¶ 9. Corporal Hunt asked defendant "if he minded" if Corporal Hunt searched his bags. Defendant initially responded that he did mind. Corporal Hunt then radioed for a canine unit to be brought to the scene to perform a search. Once he heard that, defendant clarified that he did not mind if Corporal Hunt searched his bags. Upon searching defendant's bags, Corporal Hunt discovered over ten grams of heroin in 401 bags, wrapped in forty separate bundles.

¶ 10. In denying defendant's motion to suppress, the trial court concluded that Corporal Hunt's initial stop of the cab was valid because the GPS unit adhered to the windshield violated 23 V.S.A. § 1125(a). In addition, when Corporal Hunt expanded the scope of the stop by asking the driver to exit the cab and answer questions relating to Detective Urbanowicz's suspicions of drug-related crimes, he had reasonable suspicion of drug activity based on reliable information that drug traffickers came from other states to Bennington using taxi cabs; that they used the Lucky Dragon on Main Street as a drop off point; that the passenger of the cab was looking for a Chinese restaurant but did not know its name or location; and that a large African American male, called Sizzle, was possibly involved in such drug-trafficking. Although this description is vague, the trial court concluded that it matched defendant's appearance. In addition, the court noted that defendant was only detained for about fifteen minutes, approximately the time it would take an officer to process a traffic ticket. Finally, because the trial court concluded that none of the seizures preceding defendant's consent to search his bag were unlawful, the voluntariness of his search was not tainted by prior unlawful seizures.

¶ 11. A jury subsequently convicted defendant, and the court sentenced him to ten years to ten years and one day to serve.

¶ 12. On appeal, defendant does not challenge the lawfulness of the initial stop when Corporal Hunt pulled over the cab. However, he argues that when Corporal Hunt asked the cab

driver to get out of the taxicab, Corporal Hunt expanded the stop in scope and duration. This expanded seizure for the purpose of investigating suspicions of drug-related crimes was not supported by reasonable suspicion, and defendant's subsequent consent to search was involuntary and tainted by the unlawful seizure.[2]

¶ 13. In reviewing a motion to suppress, "we apply a de novo standard to the trial court's legal conclusions, and a clear-error standard to its factual findings." State v. Pitts, 2009 VT 51, ¶ 6, 186 Vt. 71, 978 A.2d 14.

## I. Expansion of the Traffic Stop

¶ 14. The first question we must answer is: at what point, if any, did the concededly lawful traffic stop on account of Corporal Hunt's suspicion of a traffic violation expand in scope or duration such that additional reasonable suspicion was required?

¶ 15. Generally, a police officer may stop an individual where the officer has "reasonable and articulable grounds to suspect that an individual is engaged in criminal activity." Pitts, 2009 VT 51, ¶ 7; see Terry v. Ohio, 392 U.S. 1, 21, 28 (1968). Where the officer has reasonable suspicion of criminal activity, the officer "may briefly detain the individual to investigate the circumstances that gave rise to the suspicion." Pitts, 2009 VT 51, ¶ 7. However, "[t]he scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." Terry, 392 U.S. at 19 (citing Warden v. Hayden, 387 U.S. 294 (1967) (Fortas, J., concurring) (internal quotations omitted); see also State v. Ford, 2007 VT 107, ¶ 4, 182 Vt. 421, 940 A.2d 687 ("Under both the Vermont and the United States Constitutions, we have recognized that a brief detention, its scope reasonably related to the justification for the stop and inquiry, is permitted in order to investigate the circumstances that provoked the suspicion." (internal alteration and quotation omitted)).

---

[2] Defendant also challenges his sentence. Because we conclude that Officer Hunt did not have reasonable suspicion to support the expanded seizure that led to the discovery of the heroin in defendant's bag, we need not address his challenges to his sentence.

¶ 16. In the context of seizures relating to traffic violations, the law is well settled that police may stop a vehicle and briefly detain its occupants to investigate a reasonable and articulable suspicion that a motor vehicle violation is taking place. See Rodriguez v. United States, __ U.S. __, __, 135 S.Ct. 1609, 1614 (2015) ("A relatively brief encounter, a routine traffic stop is more analogous to a so-called 'Terry stop' . . . than to a formal arrest.") (internal quotations and citation omitted); State v. Lussier, 171 Vt. 19, 34, 757 A.2d 1017, 1027 (2000). As the United States Supreme Court recently reiterated, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." Rodriguez, 135 S.Ct. at 1614 (internal quotation and citation omitted). Authority for the seizure thus ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id.

¶ 17. That means an officer may make "ordinary inquiries incident to the traffic stop" and related to ensuring roadway safety, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. Id. 135 S.Ct. at 1615; see also Delaware v. Prouse, 440 U.S. 648, 658-660 (1979) (noting that during a traffic stop, "licenses and registration papers are subject to inspection"). The officer may check for outstanding warrants. Rodriguez, 135 S.Ct. at 1615. And, of course, the officer may issue a ticket for the traffic violation. But the officer may not prolong a traffic stop "to pursue an unrelated criminal investigation." Id. 135 S.Ct. at 1616.

¶ 18. With that in mind, we conclude that the police expanded the seizure beyond the scope of the reasonable suspicion supporting the traffic stop at the time Corporal Hunt asked the driver to get out of the cab and talk to him privately. By that time, Corporal Hunt had performed the routine records checks relating to traffic safety, and had apparently abandoned, or at least indefinitely suspended, any intention of ticketing the driver.[3] The focus of his inquiry pivoted

---

[3] Corporal Hunt testified that he did not ticket the driver for the GPS violation.

from the traffic infraction that supported the stop in the first place to an investigation arising from suspicion that defendant was engaged drug-related crimes. This new "mission" prolonged the traffic stop beyond the time necessary to effectuate the purpose of the traffic stop, and thus required additional reasonable suspicion to support the extended seizure. See State v. Winters, 2015 VT 116, ¶ 14, __ Vt. __, __ A.3d __ ("If, during the course of an investigative stop, an officer gathers additional information providing reasonable suspicion that some other criminal activity is afoot, the officer may extend the detention to investigate that activity." (citing State v. Cunningham, 2008 VT 43, ¶ 15, 183 Vt. 401, 954 A.2d 1290)).

¶ 19.    In reaching this conclusion, we reject the State's argument that because defendant was a passenger in the cab, rather than the driver, Corporal Hunt's prolongation of the seizure by asking the driver to get out of the car for a private conversation did not constitute a seizure of defendant. The United States Supreme Court has definitively ruled that "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver," and that reasonable passengers in a car that has been pulled over understand police officers to be "exercising control to the point that no one in the car [is] free to depart without police permission." Brendlin v. California, 551 U.S. 249, 257 (2007). For this reason, we conclude that defendant was seized when the police stopped the cab in which he was a passenger for a traffic violation, and that the seizure of defendant was prolonged when the police continued the stop for the new purpose of investigating suspicions that defendant was engaged in drug-related crimes.

## II.  Reasonable Suspicion

¶ 20.    The critical question, then, is whether the police had reasonable suspicion to prolong the seizure of defendant at the moment Corporal Hunt asked the driver to get out of the car.

¶ 21.    Reasonable suspicion of criminal wrongdoing must be based on "specific and articulable facts" and not on an officer's "inchoate and unparticularized suspicion or 'hunch.' " Terry, 392 U.S. at 21, 27.  By all appearances, defendant was engaged in entirely lawful conduct: riding in a taxicab on the streets of Bennington looking for a specific restaurant.  The question is whether the facts known to the police supported the reasonable suspicion that he was in fact engaging in criminal activity at the time.  See United States v. Sokolow, 490 U.S. 1, 9 (1989) (stating that each factor in the analysis may be "consistent with innocent" behavior, but factors taken together can form basis for reasonable suspicion).

¶ 22.    At the time Corporal Hunt asked the driver to get out of the car, the police knew: (1) The Lucky Dragon Chinese Restaurant is a known drug hotspot, and is located on Main Street; (2) Defendant was looking for the Chinese restaurant on Main Street, but thought it was called the Chinese Buffet; (3) heroin and crack cocaine dealers from out of state were using cabs and buses to travel to Bennington to distribute drugs; (4) defendant lived in Brooklyn, and was in a cab coming to Bennington from Albany; (5) police had information that an unidentified large African-American male, with the nickname "Sizzle," traveled to Bennington by taxi or by public transportation in the company of a woman named Danielle for the purpose of selling drugs; (7) defendant is a large, African-American male who was traveling to Bennington by himself in a taxicab; (8) defendant was arrested in 2010 in Dover, Vermont and has an alias of Snacks.

¶ 23.    The first two factors by themselves have virtually no probative value.  The law is clear that presence in or travel to an area of known criminal activity, without accompanying suspicious conduct or other factors, do not provide reasonable suspicion of criminal wrongdoing. Compare State v. Manning, 2015 VT 124, ¶ 15, __ Vt. __, __A.3d __ (finding officer had reasonable suspicion to suspect drugs were in the vehicle where defendant was stopped in a high-crime area and was making furtive movements) with State v. Paro, 2012 VT 53, ¶¶ 11-14, 192 Vt. 619, 54 A.3d 516 (finding officer lacked reasonable suspicion to suspect driver of idling car

8

was engaged in criminal activity merely because she was idling in the parking lot of a business where several burglaries had taken place over the years). The State does not suggest that every patron or would-be patron of the Lucky Dragon restaurant is subject to a seizure to investigate drug-related crimes, and these factors are relevant, if at all, only in combination with other considerations.

¶ 24. The next two factors likewise add little to the analysis, as they rely on conduct engaged in by a very large category of presumably innocent travelers. The United States Supreme Court considered a similar question in the case of Reid v. Georgia, 448 U.S. 438 (1980). In Reid, the Georgia Court of Appeals had concluded that a DEA agent's seizure of an individual in an airport was supported by reasonable suspicion because the individual fit a " 'profile' of drug couriers." 448 U.S. at 440. The United States Supreme Court reviewed the factors relied upon by the Court of Appeals: the defendant had arrived on a flight from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country; he arrived early in the morning when law enforcement activity was diminished; he and his companion appeared to be trying to conceal the fact that they were traveling together; and they apparently had no luggage other than their shoulder bags. 448 U.S. at 441. The Supreme Court concluded that other than the fact the defendant and another person occasionally looked back at the agent as they proceeded through the concourse, the other factors relied upon by the agents in forming their suspicion "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." Id. The Court ultimately concluded the seizure was unlawful, because the way the defendant and his companion walked through the airport did not give rise to reasonable suspicion that criminal activity was afoot, and the other factors relied upon were overbroad. Id.; see also Karnes v. Skrutski, 62 F.3d 485, 493 (3d Cir. 1995) ("[I]t is not enough that law enforcement officials can articulate reasons why they

9

stopped someone if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.").

¶ 25. Turning to this case, although heroin and crack cocaine dealers from out of state may arrive in Bennington by taxicab or bus,[4] so do out-of-state visitors coming to Vermont to ski, hike, shop, view the foliage, attend school, engage in legitimate business activites, or enjoy a quiet getaway. The act of traveling by taxi or bus from Albany to Bennington is not only entirely innocent in and of itself, but is common for law-abiding citizens. Detective Urbanowicz testified that a Yankee Trails bus arrives in Bennington (to a station near the Lucky Dragon) twice a day, and that in recent times Bennington is seeing more taxicabs from Albany. In short, the fact that defendant was riding in a taxi from Albany to a Chinese restaurant on Main Street in Bennington cannot support a reasonable suspicion that he was engaged in criminal activity just because drug dealers are known to travel by taxi or bus (or private transportation), because "a very large category of presumably innocent travelers" do the same. Reid, 448 U.S. at 441.

¶ 26. Accordingly, this case really turns on the significance of the anonymous and confidential tips that an unidentified large African-American male known as "Sizzle" was known to travel by bus or taxi to the Lucky Dragon with a woman named Danielle in order to sell drugs. The question is whether this information provides reasonable suspicion to seize a large African-American male from Brooklyn traveling alone in a taxi from Albany to a Chinese restaurant on Main Street in Bennington.

¶ 27. The reasonable suspicion relied upon by the State requires two inferences: first, that defendant was reasonably likely to be the individual known as Sizzle, and second, that

---

[4] The trial court found that the police knew that drug traffickers traveled to Bennington by bus and taxi. Detective Urbanowicz also testified that there were concerns about drugs entering Bennington by privately-owned transportation. Detective Urbanowicz acknowledged that law enforcement officers were concerned that drugs were entering Bennington by all means—an extremely broad concern that reaches all travelers coming into Bennington from other states.

Sizzle was at that time engaged in criminal activity.[5] The trial court's findings, and the State's evidence, are insufficient to support the first inference, let alone the second.

¶ 28. With respect to the defendant's identity, the information known to the police was insufficient to support the inference that defendant was Sizzle. Sizzle was known to travel with a female associate known to local law enforcement; defendant was traveling alone. Sizzle was known by the nickname "Sizzle;" the only nickname associated with defendant was "Snacks." Although both nicknames begin with an "S," they are not so similar in sound or meaning as to support an inference that one is a variant of the other. These two factors point against the inference that defendant was Sizzle.

¶ 29. On the other hand, the only shared characteristics supporting the inference that defendant was Sizzle are that both are large African-American men, and both apparently travel to Bennington by taxi or bus. The police had no further identifying information regarding Sizzle on which to base its conclusion that defendant was Sizzle. The State offered no evidence concerning, for example, how tall or short Sizzle was, whether he had short or long hair, the style of his haircut, his complexion, whether he had any particularly distinguishing physical characteristics, whether he had facial hair, what he typically wore, or any other description that could be used to compare defendant to Sizzle. Nor did the police have any particularized information to suggest Sizzle was traveling to Bennington by taxi on the day in question. They only knew Sizzle had come to Bennington to sell drugs at unspecified times in the past. For these reasons, the description of Sizzle on which the police officers' suspicion of defendant was based was so broad and vague as to sweep in any large black male getting off a bus at the station in downtown Bennington, or arriving in Bennington via taxi, and thus too general and vague to exclude a large number of presumably innocent individuals. See In re Tony C., 582 P.2d 957, 962, 969 (Cal. 1978) (in bank) (vague description of suspects in burglaries committed the day

_____

[5] The State admitted at oral argument that it did not have probable cause to arrest Sizzle for past crimes at the time of the seizure at issue here.

before as "three male blacks" could not reasonably support suspicion that two black minors in question were the missing culprits); Gaines v. State, 155 So.3d 1264, 1270 (Fla. Dist. Ct. App. 2015) ("The description of a teenage black male with short hair wearing a long dark-sleeved shirt was too vague to justify an investigatory stop."); State v. Johnson, 259 P.3d 719, 724 (Kan. 2011) ("[T]he physical description of 'black man with facial hair' was too broad to be of any assistance in formulating reasonable suspicion."); State v. Anguiano, 151 P.3d 857, 862 (Kan. Ct. App. 2007) (description of wanted person as a Hispanic man who wore a coat and "dark-type green" colored pants "is so nonspecific or generic in nature as to defy reasonable suspicion of criminal activity"); Com. v. Scott, 801 N.E.2d 233, 238 (Mass. 2004) (fact that defendant fit the general description of a "tall, muscular, black male" alleged to have perpetrated attacks at the same location about two months earlier at about the same time of night was insufficient to create reasonable suspicion to seize defendant); State v. Alexander, 2005 WI App. 231, ¶¶ 14-16, 706 N.W.2d 191 (description that suspect in a crime committed the previous day was wearing a black skull cap, black waist-length jacket, and black pants was too vague to support seizure of individual matching that description which was likely to encompass much of the area's population"); see also 4 Search & Seizure § 9.5(h) (5th ed.) (in context of search for perpetrator of recently committed crime, "the more the description [of the person sought] can be said to be particularized, in the sense that it could apply to only a few persons in the relevant universe, the better the chance of having at least sufficient grounds to make a stop."). Given the absence of any information placing Sizzle in or near downtown Bennington on the night in question, we conclude that the broad and general description of Sizzle as a large, black male was insufficient to elevate the belief that defendant might be Sizzle from a "hunch" to a reasonable suspicion.

¶ 30. Because we resolve the question of reasonable suspicion on that basis, we need not determine whether the police had reasonable grounds to seize Sizzle upon seeing him in a taxi in downtown Bennington. We note that even if the police could have reasonably inferred

that defendant was Sizzle on the basis of a more detailed and specific description, in the absence of a warrant to arrest Sizzle for his past crimes, the police would still have needed a reasonable and objective basis to suspect that Sizzle was then in possession of illegal drugs or engaged in any other criminal activity sufficient to justify an investigative detention. See, e.g., State v. Pitts, 2009 VT 51, ¶ 20 (defendant's resemblance to individual believed to deal drugs was insufficient where officers had no reasonable and objective basis to suspect he was then in possession of illegal drugs or engaged in any other criminal activity sufficient to justify an investigative detention).

¶ 31. Because the extended seizure of defendant was unconstitutional, we conclude that defendant's consent to search his bag was invalid. In general, "consent obtained during an illegal detention is invalid." State v. Betts, 2013 VT 53, ¶ 15, 194 Vt. 212, 75 A.3d 629; State v. Pitts, 2009 VT 51, ¶ 20 ("[T]he illegal detention irremediably tainted the consensual search of [the defendant's] person which immediately followed."); State v. Sprague, 2003 VT 20, ¶ 32, 175 Vt. 123, 824 A.2d 539 (illegal seizure vitiates subsequent consent to search in the absence of intervening events to attenuate the taint of the initial illegality (citing United States v. Jerez, 108 F.3d 684, 695 (7th Cir. 1997))). No intervening events attenuated the taint of the illegality of the State's extended seizure in this case, so the trial court should have suppressed the evidence obtained as a result of the search of defendant's bag.

¶ 32. For the above reasons, we reverse the trial court's ruling on the motion to suppress, vacate defendant's conviction, and remand.

Reversed and remanded.

FOR THE COURT:

_____

Associate Justice

13