¶ 1.
Eaton, J.
Defendant appeals from his conditional guilty plea to possession of cocaine, challenging the trial court’s denial of his motion to suppress. Defendant maintains that he was illegally seized when a police officer approached his parked car twice in a short period and, during the second encounter, asked him pointed questions about drugs. We agree, and therefore reverse and remand the trial court’s decision.
¶ 2. The events that gave rise to defendant’s motion to suppress occurred in the early morning hours of June 27, 2012, at the Vermont Welcome Center rest area, just off 1-91 in Guilford. The rest area is open twenty-four hours for motorists to use the restrooms and purchase refreshments. Around 1:00 a.m., a Vermont state trooper was checking license plates in the rest area parking lot when he identified a vehicle as belonging to a woman whose license was suspended. The trooper approached the vehicle and observed defendant, a male, asleep in the driver’s seat. The trooper did not make contact with defendant at this time.
¶ 3. The trooper returned to his cruiser and searched the police database, where he learned that a white male named Adam Winters, whose license was also suspended, lived at the same address as the woman who owned the car. The trooper returned to the vehicle and knocked on the window, waking the occupant *299 who confirmed that he was Adam Winters.[1] The trooper asked defendant why he had been driving with a suspended license. Defendant explained that he had been driving north on 1-91 in Massachusetts around 10:00 p.m. when he hit a deer near the Vermont border, disabling his headlight. According to defendant, a Massachusetts state trooper advised him to park overnight at the rest area rather than drive with one headlight. Defendant confirmed that he was driving his girlfriend’s car and told the trooper that she was going to pick him up in the morning. When the trooper inquired about defendant’s whereabouts in Massachusetts, defendant could not provide a specific answer.[2] The trooper told defendant not to drive without a license and to make sure that someone else picked up the car. The trooper left the scene without issuing defendant a citation, telling defendant to “rack out.”
¶ 4. Ten to fifteen minutes later, by the trooper’s estimate, the trooper returned to the scene with another trooper. He had learned that defendant had been arrested several times, with his most recent drug arrest in 2005. The trooper again knocked on defendant’s window, rousing defendant from sleep. The trooper said that he had learned that defendant had been arrested for “some drug stuff in the past” and asked defendant if he was still involved in the drug trade. Defendant replied “no,” and said that he had been taking Suboxone for four years.[3] The trooper responded that he was glad that Suboxone was working for defendant. The trooper then asked, “Given your history, coming from Massachusetts, you haven’t really told me where you’re coming from. Do you have anything that you’re not supposed to have on you? Do you have anything in the car you shouldn’t possess?” Defendant responded that he had needles but that they were old.[4] The trooper then asked defendant if he would give *300 consent to search his person or the vehicle. Defendant replied that he just wanted to go back to sleep. The trooper then said, “What’s gonna happen is I’ve got a canine coming down. He’s gonna check the car. If he alerts to the car, everything’s getting seized.”
¶ 5. At this point, defendant reached over toward the passenger seat where the trooper could not see. The trooper ordered defendant to stop. Defendant opened the door, and the trooper noticed a knife on the passenger seat. Defendant reached for the knife. The trooper pulled out his gun, and defendant put down the knife and exited the vehicle. After exiting the vehicle, defendant eventually consented to search of his person. The trooper again asked defendant for consent to search the vehicle, informing defendant that if he did not consent and the dogs alerted to the car, he would seize the car and apply for a search warrant. Defendant eventually signed a consent form authorizing the troopers to search the vehicle. According to the trooper’s affidavit, the entire encounter lasted approximately fifty minutes from the time he first woke defendant to the time defendant signed the consent card.
¶ 6. In the car, police found a small quantity of crack cocaine, eleven clear plastic glassine baggie corners with white powder-residue, and a crushed soda can with cocaine residue. Defendant admitted that he had used the can to smoke crack cocaine earlier that day and that he had purchased the crack cocaine from a dealer in Holyoke, Massachusetts. Defendant stated that he made a trip to purchase crack cocaine approximately once per month and smoked it for stress relief. Defendant was subsequently charged with possession of cocaine.
¶ 7. In October 2012, defendant moved to suppress the evidence against him, arguing that there were no facts to warrant the *301 trooper approaching his car. Defendant asserted that he had been illegally seized when the trooper awoke him a second time, with a second trooper present, and asked pointed questions about his drug history. Defendant was told that there was a canine unit en route if he was unwilling to cooperate. Defendant noted that this was the second time that he had been approached and each time the police involvement increased. Defendant maintained that a reasonable person, under these circumstances, would not have felt free to terminate the police encounter. Absent any reasonable and articulable suspicion of criminal activity, defendant argued, the trooper had no legal reason to stop him. Thus, according to defendant, the court must find that he was illegally seized and all evidence obtained as a result of the seizure must be suppressed.
¶ 8. The State opposed the motion. It argued that no seizure occurred until approximately 2:00 a.m. At that point, defendant told the trooper that he was using Suboxone and that he had hypodermic needles in the car, and the trooper asked defendant for consent to search the car, indicated that a narcotics canine was en route, and communicated that he would be seizing defendant and his car if the canine alerted to the presence of drugs. The State maintained that this encounter and all of the trooper’s encounters with defendant were supported by reasonable suspicion of a motor vehicle violation and criminal activity. The State also noted that defendant’s actions, including his initial declination of consent to search, his indication that he did not want to do anything, and his declaration that he was going back to sleep, all demonstrated that a similarly situated reasonable person would not have felt obligated to answer police questions and would not have concluded that he was being detained.
¶ 9. Following a July 2013 hearing, and additional filings by each side, the court denied the motion to suppress. It found that although the trooper’s first encounter with defendant appeared to have been consensual, the trooper developed sufficient information during this encounter to justify his final approach. The court determined that defendant was operating a motor vehicle with his license suspended in violation of 23 V.S.A. § 674, an ongoing violation that fully justified stopping him as long as he was in the driver’s seat of the car. The court found that even if the trooper intended to pursue a drug investigation, his subjective motivation was irrelevant. Objectively speaking, the court reasoned, defendant’s suspended license provided a sufficient basis for the stop. In *302 the course of that stop, the troopers developed sufficient information to justify an escalation of the investigation, i.e., defendant was in possession of hypodermic needles for a drug that is not administered intravenously and he had a prior drug conviction.
¶ 10. In reaching its conclusion, the court noted that its decision was limited to the facts found. If either of the first two interactions between the trooper and defendant had, in fact, amounted to a detention or seizure for the traffic violation and had that traffic offense investigation reached a conclusion, it would be more arguable that the third approach with little additional information other than defendant’s prior drug-related offense record would not have justified another seizure. The court concluded, however, that those facts were not present here. The court thus denied defendant’s motion. Defendant entered a conditional guilty plea, reserving the right to appeal the trial court’s order denying his motion to suppress. This appeal followed.
¶ 11. On appeal, defendant argues, as he did below, that his second encounter with the trooper was an illegal seizure in violation of the Fourth Amendment to the United States Constitution and Chapter I, Article 11 of the Vermont Constitution. Specifically, defendant asserts that the driving-with-a-suspended-license (DLS) investigation had concluded, and that the trooper needed, and lacked, reasonable suspicion to conduct a drug investigation.[5] We agree that defendant was illegally seized at the outset of the second face-to-face encounter with the trooper, and thus, his motion to suppress should have been granted.[6] See State v. Button, 2013 VT 92, ¶ 8, 195 Vt. 65, 86 A.3d 1001 (on review of denial of *303 motion to suppress, Supreme Court reviews factual findings for clear error and reviews legal conclusions de novo).
¶ 12. The Fourth Amendment to the United States Constitution and Chapter I, Article 11 of the Vermont Constitution protect citizens against unreasonable searches and seizures. U.S. Const, amend. IV (providing that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated”); Vt. Const. ch. I, art. 11 (providing that “the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure”); see State v. Berard, 154 Vt. 306, 309, 576 A.2d 118, 120 (1990) (noting that, although Article 11 does not expressly limit protection to “unreasonable” searches, we consistently have imported “reasonableness” standard of Fourth Amendment into Article 11).
¶ 13. The law with respect to automobile seizures is well developed. Normally, a seizure requires that an officer have probable cause that a defendant has committed a crime. See U.S. Const, amend. IV. In Terry v. Ohio, however, the United States Supreme Court developed a very circumscribed exception to the probable-cause requirement for seizures that are limited in their scope and duration and do not rise to the level of full arrests. 392 U.S. 1, 27-29 (1968). Such an intrusion must be justified by reasonable and articulable suspicion of criminal activity and cannot be based on the officer’s “inchoate and unparticularized suspicion or ‘hunch.’ ” Id. at 21, 27; see State v. Simoneau, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280 (same).
¶ 14. Reasonable suspicion of a traffic violation can form the basis for a valid stop,[7] State v. Lussier, 171 Vt. 19, 34, 757 A.2d 1017, 1027 (2000), but the detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. Florida v. Royer, 460 U.S. 491, 500 (1983); State v. Sprague, 2003 VT 20, ¶ 17, 175 Vt. 123, 824 A.2d 539. If, during the course of an investigative stop, an officer gathers additional information providing reasonable suspicion that some other criminal activity is afoot, the officer may extend the detention to investigate that activity. *304 State v. Cunningham, 2008 VT 43, ¶ 15, 183 Vt. 401, 954 A.2d 1290. “ ‘In determining the legality of a stop, courts do not attempt to divine the arresting officer’s actual subjective motivation for making the stop; rather, they consider from an objective standpoint whether, given all of the circumstances, the officer had a reasonable and articulable suspicion of wrongdoing.’ ” State v. Davis, 2007 VT 71, ¶ 7, 182 Vt. 573, 933 A.2d 224 (mem.) (quoting Lussier, 171 Vt. at 23-24, 757 A.2d at 1020). That an officer’s true motivation for stopping a vehicle or approaching an individual is to investigate drug possession or other criminal activity has no bearing on the legality of the detention, so long as, from an objective standpoint, the officer had reasonable and articulable suspicion of a traffic or other violation.
¶ 15. Defendant concedes that he was not seized during his first face-to-face encounter with the trooper, and we find it unnecessary to address whether a seizure in fact occurred. The first face-to-face encounter ended when the trooper told defendant to “rack out.” We reject the notion that there was an “ongoing” DLS violation that authorized the trooper to continue to approach the car again and again, as long as defendant sat behind the wheel. It is evident that the trooper had concluded the DLS investigation, and a reasonable person in defendant’s position would have concluded that the DLS matter had been completed as well. Because defendant concedes that he was not seized during his first encounter with the trooper, moreover, cases addressing the circumstances under which a lawful seizure may be extended are inapposite. See, e.g., Arizona v. Johnson, 555 U.S. 323, 333 (2009) (explaining that lawful roadside stop begins when vehicle pulled over for investigation of traffic violation, and temporary seizure remains reasonable for duration of stop, and stating that officer’s inquiries into matters unrelated to justification for traffic stop do not convert encounter into something other than lawful seizure as long as those inquiries do not measurably extend duration of stop); see also Rodriguez v. United States, _ U.S. _, _, _, 135 S. Ct. 1609, 1612, 1615 (2015) (holding that “a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution’s shield against unreasonable seizures,” and that this rule applies to dog sniff, which cannot be characterized as part of officer’s traffic mission).
¶ 16. We have recognized that, employing a totality-of-the circumstances analysis, there is a point at which “mere question *305 ing or ‘field inquiry’ ” constitutes “a detention requiring some level of objective justification.” State v. Pitts, 2009 VT 51, ¶ 8, 186 Vt. 71, 978 A.2d 14. In deciding if this point has been reached, we must consider the officer’s conduct “as a whole,” mindful that “ ‘what constitutes a restraint on liberty prompting a person to conclude that he is not free to “leave” will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.’ ” Id. (quoting Michigan v. Chesternut, 486 U.S. 567, 573 (1988)). Both this Court and other courts have held that although “ ‘mere questioning’ may not constitute a seizure per se, pointed questions about drug possession or other illegal activity in circumstances indicating that the individual is the subject of a particularized investigation may convert a consensual encounter into a Terry stop requiring objective and articulable suspicion under the Fourth Amendment.” Id. ¶ 9. As stated above, we consider the totality of the circumstances in deciding if a seizure has occurred, and we reject the dissent’s contention that we are applying a “per se” rule here.
¶ 17. While the facts of Pitts might be distinguishable from the instant case, the legal principles enunciated therein are applicable. Additionally, the out-of-state cases that we relied on in Pitts are directly analogous here. In State ex rel. J.G., 726 A.2d 948 (N.J. Super. Ct. App. Div. 1999), for example, a police officer approached an adult and a juvenile in a train station, having observed behavior that led the officer to believe that the pair were engaged in drug trafficking. The officer asked the individuals where they had been coming from, and received contradictory answers. In a conversational tone, the officer asked the adult if there was “anything on him that I should know about.” Id. at 950. The adult replied “no,” and invited the officer to perform a pat-down, which the officer did. At no time did the officer draw his weapon, threaten either individual, or restrain their movement. He did not tell the pair that they had to stop or that they were not free to leave.
¶ 18. After patting down the adult, the officer asked the juvenile “if there was anything on him that he shouldn’t have.” Id. The juvenile also said “no,” and agreed to a pat-down. The officer found a box of cigar holders associated with smoking marijuana. He then asked the juvenile what was in his backpack. The adult responded that it contained jackets. The officer then asked the juvenile, “Do you mind if I search the backpack?” The juvenile *306 agreed although he appeared to be in a state of “sheer panic.” Id. at 951. Inside the backpack, the officer found numerous small plastic bags, which he recognized as drug-sale paraphernalia, as well as three bags of marijuana.
¶ 19. The court concluded that although the encounter between the officer and the juvenile began as a field inquiry, it turned into a seizure when the officer asked questions that presupposed criminal activity, i.e., whether the juvenile had anything on him that he shouldn’t have. Id. at 953. The court reached this conclusion even though the officer’s tone and manner were “unexceptional,” and the officer made no demands nor issued any commands. Id. The court considered the officer’s initial words “unduly authoritative, indicative of a criminal suspicion, and harassing.” Id. It found that the officer’s question would make a reasonable person believe that he was the subject of a particularized investigation, and thus, at that point, the field inquiry was automatically converted to a Terry stop that required a reasonable and articulable suspicion before a search was conducted. Id. at 958-54.
¶ 20. The Utah Supreme Court engaged in a similar analysis in State v. Alverez, 2006 UT 61, ¶ 12, 147 P.3d 425. In that case, two police officers waited for the defendant and then surprised him alone in a residential parking lot. They asked the defendant if he knew that his vehicle was uninsured and then stated that the vehicle was suspected of being connected to drug dealing. Id. ¶¶ 5-6. The defendant denied any knowledge of drug dealing, and denied having any drugs on him. The defendant subsequently tried to swallow fifteen drug-filled balloons and the officers prevented him from doing so.
¶ 21. The court found that the defendant had been seized, although it did not specify the point at which the seizure occurred. “Under the circumstances in this case,” it explained, “where two uniformed police officers waited for and then approached [the defendant] and accused him of not one, but two illegal acts — lack of car insurance and drug trafficking — a reasonable person would not have felt free to leave.” Id. ¶ 11. The court recognized that the police may ask individuals potentially incriminating questions, and that questioning alone does not automatically constitute a seizure. Nonetheless, “the manner of questioning, the content of the questions, and the context in which the questions are being asked can convert ‘mere questioning’ into a . . . seizure *307 if, under all of the circumstances, a reasonable person would not feel free to leave.” Id. ¶ 12 (footnote omitted). The court considered the officers’ first two questions to be accusatory, and given the context in which the questions were asked, concluded that this demonstrated a “‘show of authority’ sufficient to restrain [the defendant’s] freedom of movement.” Id.
¶ 22. The New Mexico Supreme Court similarly recognized in State v. Jason L., 2000-NMSC-018, 2 P.3d 856, that “questions asked in an accusatory, persistent, and intrusive manner can make an otherwise voluntary encounter coercive.” Id. ¶ 17 (quotation and alterations omitted). Other courts have reached similar conclusions as well, as we explained in Pitts, 2009 VT 51, ¶ 13. See, e.g., United States v. Nunley, 873 F.2d 182, 184-85 (8th Cir. 1989) (holding that consensual encounter became seizure which invalidated subsequent consent to search where police officers’ statements to the defendant that they were attempting to stop the flow of drugs indicated that the defendant was the “particular focus of a narcotics investigation”); State v. Contreras, 742 A.2d 154, 160-61 (N.J. Super. Ct. App. Div. 1999) (concluding that narcotics officers “clearly conveyed to defendants the message that the officers suspected them of criminal activity,” which escalated consensual encounter to seizure where the officers had defendants exit a train, explained that they were investigating drug trafficking, and asked defendants if they were carrying any contraband); Parker v. Commonwealth, 496 S.E.2d 47, 49, 51 (Va. 1998) (holding that, where police clearly followed the defendant and then “asked the defendant if he had any guns or drugs in his possession,” a reasonable person would not have believed that he was free to leave).
¶ 23. We reach the same conclusion here. While the officer’s first approach did not constitute a seizure, it provides an important context for the second approach. After talking initially with defendant, the trooper informed defendant that he was free to go to sleep. This would signify to a reasonable person that the encounter was over. Nonetheless, the trooper re-approached the car thereafter, this time accompanied by a second trooper. He knocked on the window, waking defendant up a second time. The fact that the officer had already concluded his exchange with defendant and then came back with an additional law enforcement officer distinguishes this case from a situation where an officer encounters someone and asks a few questions. At the time of the *308 second face-to-face encounter, the trooper was conducting a drug investigation and he had by that point called for back-up and a drug-detecting dog.
¶ 24. The officer began his second round of questioning with a specific assertion reflecting an individualized investigation of defendant’s background. He referred to defendant’s arrest record, and his initial question to defendant was “are you still in the drug trade?” This was not an “open-ended” or innocuous question. Instead, it was accusatory, intrusive, and it presupposed criminal activity related to drugs despite the most recent indication of any drug involvement by defendant being in 2005. There is a significant difference between this type of questioning and the type of generalized questions involved in the cases cited by the dissent. Post, ¶ 43.[8] The officer’s individualized focus on this particular defendant has a significant bearing on whether a reasonable person in defendant’s position would feel free to terminate the encounter. The fact that the officer returned with a second trooper is also relevant in assessing whether a reasonable person would feel that he or she was subject to a particularized inquiry and was not free to terminate the encounter.
¶ 25. Following his initial question, the officer continued to question defendant in the same vein, asking defendant if he had anything that he should not possess on him or in his car. This is the precise question at issue in J.G., a question that the New Jersey court aptly characterized as “unduly authoritative, indicative of a criminal suspicion, and harassing.” 726 A.2d at 953. It is also worth noting that the officer never told defendant that he was free to terminate the encounter. See Florida v. Bostick, 501 U.S. 429, 432, 437 (1991) (finding it significant that officers specifically told defendant that he could refuse to consent to search of his *309 luggage in assessing whether seizure occurred); see also Jones, 701 F.3d at 1314 (recognizing that although police officers are not required to inform individual that he or she is free to leave, their failure to do so “is a factor to consider” in assessing totality of circumstances). At this point in the exchange, just as in J.G., a reasonable person would have felt he was the subject of a particularized inquiry, and would not have felt “at liberty to ignore the police presence and go about his business.” Bostick, 501 U.S. at 437 (quotation omitted). It is significant that the second encounter occurred after the first had conclusively ended. The officer had left the scene, telling defendant to “rack out.” Given this instruction to defendant, the officer’s subsequent return to the scene would make a reasonable person less likely to believe that he could voluntarily terminate the encounter.
¶ 26. The officer’s actions here — approaching and waking defendant, concluding the first interaction, and then returning with a second trooper, waking defendant again, and asking him pointed questions about criminal activity — is not the type of “mere questioning” described in Bostick. Indeed, this Court has taken a very narrow view of Bostick, construing it to hold “merely that general police questioning within the confines of a bus did not establish a seizure ‘per se.’ ” Pitts, 2009 VT 51, ¶ 18 (emphasis added).
¶ 27. Consistent with our holding in Pitts, and the cases discussed therein, we conclude that the officer’s field inquiry was converted into a Terry stop at the outset of the second encounter when the officer asked pointed questions of defendant. At that point, the officer did not have reasonable suspicion of criminal activity. He had not gleaned any information on his first approach to indicate that defendant had any contraband, and defendant’s stale arrest record did not provide the officer with reasonable suspicion. We should not countenance a seizure “based on luck and hunch.” Contreras, 742 A.2d at 161 (quotation omitted). The officer had nothing to suggest any current drug activity beyond defendant’s comments that he had been coming from Massachusetts, a comment which hardly supports a suspicion of drug possession. A prior arrest nearly a decade earlier does not continue to render defendant subject to pointed questions about his drug use indefinitely absent some reasonable articulable suspicion justifying the seizure. The officer was acting solely upon his hunch of current *310 drug possession based primarily upon stale information. This hunch did not amount to reasonable articulable suspicion. Because defendant was illegally seized, his subsequent “consents” to the search of his person and car, which occurred very shortly thereafter, were “tainted and ineffective.” Sprague, 2003 VT 20, ¶ 31 (reaching similar conclusion); see also Pitts, 2009 VT 51, ¶ 20 (concluding that where officers had no reasonable and objective basis to suspect that defendant was engaged in any criminal activity sufficient to justify investigative detention, detention was therefore “plainly invalid . . . and it is equally plain that the illegal detention irremediably tainted the consensual search of [the defendant’s] person which immediately followed”). The motion to suppress should have been granted.

Reversed and remanded.

 Although this was actually the officer’s second approach to defendant’s vehicle, it was officer’s first personal interaction with defendant and we refer to it as the first approach in this opinion.

 The video indicates that the trooper asked defendant “Where in Mass?” and defendant answered, “Uh ... I dropped my buddy off there dude. And I just dropped him off and headed back up.” After the sound “uh,” there is a significant pause during which defendant appears to be muttering something. The content is low in volume and inaudible.

 Suboxone is a drug prescribed to treat opiate addiction.

 Defendant’s initial response regarding the needles went as follows:
Defendant: No, just got some used needles in here.
*300 Trooper: Used needles?
Defendant: No, not used, new.
Trooper: Are you a diabetic?
Defendant: Nope, they’re old.
Trooper: They’re old? Okay. Other than needles, do you have anything else in the car?
Defendant: No, sir.
Later in the encounter, defendant stated that he shoots the Suboxone with the needles. When the officer responded that Suboxone does not come in a form to be injected, defendant answered that he puts it in water.

 The State claims that defendant failed to preserve two points for our review: one, that defendant was seized upon his first encounter with the trooper; and two, that the trooper terminated the suspended license investigation at the end of the first encounter and could not resurrect the investigation during the second encounter. As to the first issue, defendant correctly points out that he does not take that position on appeal but merely addressed the nature of the first encounter in a footnote in his brief. As to the second issue, defendant also correctly points out that he raised this at the motion hearing and in his post-hearing motion in support of his request to suppress.

 Defendant also contests the voluntariness of his consent to search the vehicle, arguing that he merely acquiesced to the trooper’s claim of lawful authority. While defendant did not reserve the right to raise this issue in his conditional plea, our conclusion on defendant’s motion to suppress renders a discussion of this issue unnecessary.

 While in the common search and seizure parlance the term “stop” is shorthand for a seizure, there can be a seizure without a stop. This case arguably involves such a situation. In fact, use of the term stop in this case leads only to confusion.

 One of the cases cited by the dissent, United States v. Jones, 701 F.3d 1300, 1314-15 (10th Cir. 2012), did involve an accusatory question. In that case, after identifying himself as a law enforcement officer conducting a drug investigation, the officer stated to the defendant, “I’m here for your marijuana plants.” Id. at 1305. The Jones court concluded that despite the “accusatory nature” of this question, and the “somewhat jolting” effect it would have on a reasonable person, a reasonable person under the totality of the circumstances surrounding this encounter would not have been “so cowed by such an accusatory assertion that he would have believed that he was not free to discontinue the encounter and go about his business.” Id. at 1314. As is evident, we are faced here with a different “totality of the circumstances,” and we have reached a different conclusion based on the facts presented here.