NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 119

No. 2016-258

| State of Vermont | Supreme Court |
|---|---|
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| Philip M. Tetreault | April Term, 2017 |

Katherine A. Hayes, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

William W. Cobb of Law Offices of William W. Cobb, PLC, St. Johnsbury, for
  Defendant-Appellant.


PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Dooley, J. (Ret.),
        Specially Assigned


¶ 1.    **SKOGLUND, J.**   Defendant Philip Tetreault appeals his convictions for heroin trafficking and conspiracy to sell or deliver a regulated drug. He argues that the trial court erred in denying his motion to suppress evidence gathered from his vehicle during a traffic stop. We affirm.

¶ 2.    The trial court made the following findings in its decision denying defendant's motion to suppress. On October 21, 2014 at 10:04 a.m., a Vermont State Police trooper was parked facing the southbound lane of Interstate 91 in Guilford, Vermont, when he saw a vehicle travel past him at eighty miles per hour in a sixty-five-mile-per-hour zone. He pulled out to stop the vehicle. The car stopped very abruptly on the highway shoulder, and the reverse lights flashed on.

¶ 3.     The trooper saw the driver's head move to the right of his seat and disappear from view at least twice.  The trooper became concerned that the driver was attempting to conceal contraband or get a weapon.  He approached the vehicle on the passenger side and spoke to defendant, who was the sole occupant of the vehicle.

¶ 4.     Defendant's hands were shaking as he handed over a plastic case containing his registration and insurance documents.  The trooper handed the case back to defendant and asked him to remove the relevant documents.  As defendant did so, his hands continued to tremble.  The trooper noticed a GPS unit, a cellular telephone that he believed was a TracFone, and an air freshener in the vehicle.  The trooper testified that many individuals involved in drug trafficking use prepaid TracFones because they are easy to dispose of and that air fresheners are often used to mask the odor of drugs in a vehicle.

¶ 5.     The trooper asked defendant where he was headed.  Defendant said he was driving to Waterbury, Connecticut, from his home in Lowell, Vermont, to buy an engagement ring.  The trooper found defendant "overly nervous for a routine traffic stop."  After checking defendant's license status, he gave defendant a written warning and told him to slow down.  Defendant's hands were still shaking when the interaction with the trooper ended.  The trooper testified that drivers who are nervous during a traffic stop usually calm down significantly by the end of the interaction, but defendant remained excessively nervous.

¶ 6.     After the stop, the trooper called a Newport City police officer who knew defendant.  The Newport officer told the trooper that about eight months earlier, a confidential source had told him that defendant was involved in selling pills and heroin, and would travel to Massachusetts or Connecticut to pick up drugs.  The trooper used an Internet-based mapping program to determine that it would take approximately one hour and forty-seven minutes to travel from Brattleboro to Waterbury, Connecticut.  It would take forty-five to forty-eight minutes to

2

travel from Brattleboro to Holyoke, Massachusetts, which is a known source of drugs entering Vermont.

¶ 7. Later the same day, the trooper was parked alongside the northbound lane of Interstate 91 in Guilford. At 12:52 p.m., he observed defendant's vehicle travel past him. He followed defendant and paced defendant's vehicle, determining it was traveling between seventy and seventy-five miles per hour, or five to ten miles over the speed limit. The trooper pulled defendant over. He saw defendant lean over toward the passenger side of the car. Before he stopped defendant's car, the trooper radioed for a K-9 unit to come to the scene, as he was now suspicious that defendant was involved in drug-related activity.

¶ 8. As the trooper approached the vehicle, he again observed the driver moving around as if he was hiding or accessing something. Defendant was alone in the vehicle. The TracFone, air freshener, and GPS unit were still in place. The trooper again requested defendant's documentation, and told defendant that he stopped defendant for speeding. The trooper asked if defendant had made it to Waterbury. Defendant told the trooper that he had not gone to Waterbury, but had gone to the Holyoke Mall instead. The trooper asked defendant if he had purchased the engagement ring. Defendant answered that he had not, because it was more expensive than he anticipated. While speaking to defendant, the trooper noticed what he believed to be marijuana "shake" around the center console. He did not take the suspected marijuana into evidence. At the suppression hearing, defendant introduced a photo that appeared to show signs of chewing tobacco use in the vehicle, as well as a can of chewing tobacco and a spit can.

¶ 9. The trooper told defendant that he would write defendant another warning for speeding, and asked if defendant would mind exiting the vehicle and coming to his cruiser while he did so. The trooper told defendant he did not have to if he did not want to. Defendant exited the vehicle, and with defendant's consent, the trooper patted down his exterior clothing before both men sat in the front seats of the cruiser.

3

¶ 10.   The trooper asked defendant about his trip while writing the warning.  The trooper noted that defendant was nervous, uncertain, and had a quivering voice.  Defendant identified two stores that he visited at the Holyoke Mall.  He told the trooper that he had learned that his daughter was ill, so he could not go all the way to Waterbury as planned.  When asked by the trooper whether he had gone to Holyoke to pick up drugs, defendant responded, "No, I swear on my daughter's life."  The trooper asked defendant to roll up his sleeves and tip his head back so the trooper could look for signs of drug use.  Defendant complied.

¶ 11.   The trooper then asked defendant, "Do you have any objections to me searching the car?  Would that be all right with you?"  Defendant responded, "Yeah, you can."  The trooper said, "That's okay?"  Defendant replied, "Is there probable cause, I mean—" and the trooper said, "No."  Defendant said that he didn't understand why the trooper wanted to search the car.  The trooper told him that his story was "shaky in the beginning."  Defendant said, "I know my rights and I would prefer if you would get a warrant if you're gonna search."  Defendant offered to open the glove box for the trooper.  The trooper said he was interested in searching "the whole shooting match."  Defendant then talked about participating in the search of the car and the trooper said, "I mean me search, not us.  Is that okay?"  Defendant responded, "Yeah."

¶ 12.   The trooper then presented defendant with a consent card.  He told defendant that he would read it to defendant and allow defendant to read it himself, and then defendant could decide whether to allow the search.  Defendant responded, "Okay."  The trooper read the entire card to defendant, then gave the card to defendant and asked him to read it, and if he agreed, to sign the card.  Defendant signed the consent card without asking any questions.  The card stated that defendant "freely" gave his permission to the trooper "to conduct a complete search" of the vehicle and its contents, and stated "I understand I do not have to allow this.  No threats or promises have forced this consent."

¶ 13.    During this exchange, the K-9 unit requested by the trooper had arrived. The trooper and defendant exited the cruiser, and the trooper began searching defendant's vehicle. He found a pill bottle containing marijuana and a smoking pipe. The trooper decided to have the dog sniff the vehicle.

¶ 14.    The trooper asked defendant, "You all right with us running the dog through?" Defendant responded, "I don't see the need." The trooper told him, "Sometimes I miss things." Defendant said, "I'd rather just go home. . . . Why can't we do that?" The trooper said, "We can. I just want to make sure I didn't miss anything. Is that okay if the dog goes through?" Defendant responded, "Yeah. Run her though." Defendant asked if he could sit in his car, and the trooper said he could not do so while the dog was inspecting the car. Defendant then said that he thought the trooper needed a warrant for the dog to go through the car. The trooper said he did not, because it was just like the trooper going through the car. Defendant responded, "I thought it was different."

¶ 15.    The K-9 officer had the dog sniff the car. The dog alerted at the front console area and on a purse in the vehicle. Within the purse were 420 bags of a substance that tests indicated to be heroin. There was also some dog food in the purse. The K-9 officer testified that a drug dog's reaction to smelling dog food is different than its reaction to illegal drugs. More heroin was found in separate bags, for a total of 14.4 grams including packaging. Defendant was arrested and charged with heroin trafficking and conspiracy to sell or deliver a regulated substance.

¶ 16.    Defendant filed a motion to suppress the evidence gathered as a result of the stop. The trial court denied the motion in a written decision. It concluded based on the above findings that: (1) defendant voluntarily exited his vehicle and was not coerced or threatened into doing so; (2) even if his exit had not been voluntary, the trooper had a reasonable suspicion of criminal activity sufficient to justify an exit order; (3) defendant's consent to search the vehicle was voluntary; (4) defendant was not in custody for Miranda purposes when he was speaking to the

trooper in the cruiser; (5) defendant did not withdraw consent to search his vehicle; and (6) the search did not exceed the scope of consent.

¶ 17. Defendant filed a motion to reconsider, arguing that the court failed to address his argument that the police may not expand a traffic stop into a drug investigation without reasonable suspicion. He also argued that the dog's alert was insufficient to establish probable cause for a further search of the vehicle because the K-9 officer testified that the dog, when alerting, could not distinguish between drugs currently in the vehicle and drugs which were previously in the vehicle, or between small and large amounts of marijuana. The court ruled that the trooper had reasonable suspicion of drug activity to expand the scope of the traffic stop. The court further held that because defendant consented to the search of his vehicle, it was irrelevant whether the dog's alert created probable cause to search.

¶ 18. Defendant waived his right to a jury, and the court held a trial in April 2016. The court found defendant guilty of both charges, and imposed a sentence of two to ten years. This appeal followed.

¶ 19. In reviewing a trial court's denial of a motion to suppress evidence, we will uphold the court's factual findings unless clearly erroneous. State v. Mara, 2009 VT 96A, ¶ 6, 186 Vt. 389, 987 A.2d 939. Our review of conclusions of law, including whether the facts as found are sufficient to justify the actions taken by police, is de novo. Id.

¶ 20. Both the Fourth Amendment to the United States Constitution and Article Eleven of the Vermont Constitution protect persons from unreasonable searches and seizures. U.S. Const. amend. IV; Vt. Const. ch. I, art. 11; State v. Savva, 159 Vt. 75, 87, 616 A.2d 774, 781 (1991). A traffic stop constitutes a seizure under either provision, and must be supported by reasonable suspicion that a motor vehicle violation or other crime is taking place. Whren v. United States, 517 U.S. 806, 809-10 (1996); State v. Cunningham, 2008 VT 43, ¶ 15, 183 Vt. 401, 954 A.2d 1290. A detention for purposes of investigating a traffic violation "must be temporary and last no

longer than is necessary to effectuate the purpose of the stop." State v. Ryea, 153 Vt. 451, 455, 571 A.2d 674, 676 (1990) (quotation omitted). An investigative traffic stop may be extended if an officer has a reasonable suspicion of criminal activity sufficient to justify the post-stop investigative expansion. See Cunningham, 2008 VT 43, ¶ 30 (explaining that expansion is additional seizure and therefore must—like initial stop—be supported by reasonable, articulable suspicion of wrongdoing).

¶ 21. Defendant does not dispute that the trooper had reasonable suspicion to stop him for speeding in both instances. He contends, however, that the trooper impermissibly expanded a traffic stop into a drug investigation and ordered to him to exit his vehicle without reasonable suspicion that a crime had been committed; subjected him to overly intrusive interrogation in the cruiser, thus rendering his consent to search the vehicle ineffective; and unlawfully continued to search his vehicle after he withdrew consent. He further argues that the trial court erred by refusing to reconsider his motion to suppress at trial and denying his motion for a new trial.

¶ 22. We first consider defendant's argument that the trooper lacked justification to ask him to exit the car. The Fourth Amendment permits a police officer to order the driver of a lawfully stopped vehicle to exit the vehicle as a matter of course; no further justification is necessary. See Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977). However, we have adopted a more stringent test under the Vermont Constitution. Under Article Eleven, an exit order is justified only when "the objective facts and circumstances would support a reasonable suspicion that the safety of the officer, or of others, was at risk or that a crime has been committed." State v. Sprague, 2003 VT 20, ¶ 16, 175 Vt. 123, 824 A.2d 539.

¶ 23. In Sprague, the defendant was stopped for speeding while driving on the interstate highway. After requesting the defendant's license and registration and asking several questions related to the reason for the stop, the officer said, "you mind having a seat in my car while I check your license, please?" In response, the defendant exited the vehicle. At the officer's request, the

7

defendant emptied his pockets, revealing a small packet which he admitted contained marijuana. The officer subsequently searched defendant's car, and then his house, where several marijuana plants were found. The trial court denied the defendant's motion to suppress the evidence, ruling that the defendant voluntarily exited the car and consented to the searches. Id. ¶¶ 2-9.

¶ 24. We reversed, holding that there was no evidence that the officer had a reasonable, objective basis for his exit request. Id. ¶ 21. The officer did not claim that he had a specific safety concern, or that there was anything unusual about the location, time of day, or traffic that would justify a request to exit the vehicle. He acknowledged that the defendant did not appear to be armed and dangerous. Id. There was also no evidence that the defendant was engaged in any criminal offense requiring further investigation. Id. ¶ 22.

¶ 25. We rejected the State's argument that the defendant voluntarily exited the vehicle, holding that "[t]he critical inquiry is 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" Id. ¶ 26 (quoting Florida v. Bostick, 501 U.S. 429, 436 (1991)). Our conclusion that defendant did not voluntarily exit the car was based on several factors. First, the setting was "inherently coercive" because the defendant "had already been seized by virtue of the initial motor vehicle detention and the officer's show of authority." Id. ¶ 28. Second, the officer asked the defendant to exit the vehicle almost immediately after he asked for his license and registration, and "[t]he latter request plainly communicated no more choice to defendant than the former." Id. ¶ 29. Finally, the officer did not inform the defendant that he could refuse to exit the vehicle. Id. Because the exit order was not justified by safety concerns or reasonable suspicion, and the defendant did not voluntarily exit the car, we determined that the defendant's subsequent consents to the search of his person, car and home were tainted and ineffective, and the evidence gathered ought to have been suppressed. Id. ¶ 31.

¶ 26. The circumstances here differ significantly from those in Sprague. First, the record supports the trial court's conclusion that defendant voluntarily exited the vehicle. While defendant

8

was faced with the same situation as the defendant in Sprague, a traffic stop by a police officer, there the similarity ends. Here, the trooper's request to exit the car did not immediately follow his request for defendant's license and registration, as it did in Sprague. Instead, the trooper and defendant discussed defendant's trip to Massachusetts and his search for an engagement ring, as well as the possibility that defendant's speedometer was malfunctioning. The video shows that the trooper's demeanor was relaxed and friendly during this discussion. The timing and tone of the request was separated from the obligatory "request" for defendant's license and registration.

¶ 27. Moreover, in this case the trooper expressly told defendant that he could refuse to leave the vehicle, saying, "Phil, you don't have to if you don't want to, it's just—it would be easier if you came on back real quick. I'll write you a warning again." Defendant replied, "Okay," and exited the vehicle. As we explained in a previous case, "the giving of such advice supports the conclusion that the consent was voluntary." State v. Weisler, 2011 VT 96, ¶ 37, 190 Vt. 344, 35 A.3d 970. We conclude that a reasonable person in defendant's circumstances would have felt free to refuse the officer's request when the officer told him he did not have to agree to get out of his car, making his decision to exit the car voluntary.

¶ 28. This case also differs from Sprague in another significant respect. In Sprague we noted that there was no indication defendant was engaged in any criminal offense beyond the traffic violation. However, here, the trooper had a reasonable and objective basis to suspect that an additional drug-related crime was being committed. See Sprague, 2003 VT 20, ¶¶ 16, 22. This takes us to defendant's second argument—that the officer impermissibly expanded a traffic stop into a drug investigation.

¶ 29. In determining whether an officer had reasonable suspicion to expand an interaction, we look at the totality of the circumstances. State v. Manning, 2015 VT 124, ¶ 14, 200 Vt. 423, 132 A.3d 716. "Although each factor in the analysis in isolation may be consistent with innocent behavior, the factors taken together can form the basis for reasonable suspicion."

9

Id. We have therefore cautioned against using a "divide-and-conquer analysis" in which the court assesses each factor individually and gives no weight to conduct that by itself is not probative of wrongdoing. Id. (quotation omitted).

¶ 30. Here, the trooper had the following information when he interacted with defendant the second time: (1) defendant originally told the trooper that he was traveling from his home in Lowell, Vermont, to Waterbury, Connecticut, to buy an engagement ring; (2) defendant's return time was not consistent with his stated destination; (3) defendant admitted he was returning from Holyoke, Massachusetts, a known source of drug trafficking in Vermont; (4) both times he was pulled over, defendant reached down and out of sight toward the passenger seat, as though he were hiding something; (5) defendant acted nervous, and his voice was trembling throughout both interactions with the trooper; (6) in his car, defendant had what appeared to be a prepaid untraceable TracFone as well as an air freshener, which is often use to mask the odor of drugs; (7) a confidential informant had told a Newport police officer that defendant was involved in selling heroin and pills and would drive to Massachusetts or Connecticut to obtain them; and (8) the trooper observed what appeared to be marijuana "shake" on the center console.

¶ 31. Viewed in isolation, some, if not all, of these factors would be insufficient to form the basis for a reasonable suspicion of wrongdoing. However, the circumstances as a whole, viewed objectively by a trooper with training and experience in drug interdiction, gave rise to a reasonable suspicion that drug-related activity was occurring. See Manning, 2015 VT 124, ¶ 16.

¶ 32. First, unusual or conflicting travel plans can give rise to reasonable suspicion. See United States v. Dion, 859 F.3d 114, 125 (1st Cir. 2017) (listing driver's odd explanation for his trip—that he was traveling from his home in Arizona to visit his accountant in Pennsylvania—as factor supporting reasonable suspicion); United States v. Riley, 684 F.3d 758, 764 (8th Cir. 2012) (holding that defendant's vague and conflicting answers to simple questions about his itinerary, along with nervousness and misrepresentation of criminal history, gave officer reasonable

suspicion to detain defendant); United States v. Santos, 403 F.3d 1120, 1129 (10th Cir. 2005) ("Implausible travel plans can contribute to reasonable suspicion."). As the trooper testified, he found it odd for defendant to be driving all the way from northern Vermont to Waterbury, Connecticut to purchase an engagement ring when there were many jewelry stores closer to his home. Further, defendant did not follow his own stated itinerary. Defendant admitted he had actually gone to Holyoke and had not purchased a ring. That defendant's actions were inconsistent with his stated travel plans supported the trooper's suspicion.

¶ 33. Further, although travel to or from a city known to be a source of drugs, in this case Holyoke, Massachusetts, by itself cannot support reasonable suspicion, see State v. Alexander, 2016 VT 19, ¶ 25, 201 Vt. 329, 139 A.3d 574, it can be probative of illegal conduct when viewed together with other factors. See United States v. Sokolow, 490 U.S. 1, 9 (1989) (listing defendant's travel to known source city for illicit drugs as one of several factors supporting reasonable suspicion). Similarly, the presence in defendant's car of the air freshener and prepaid TracFone, items which are often associated with drug trafficking activity, supports reasonable suspicion as part of the totality of the circumstances. See United States v. Lopez, 553 F. App'x 10, 12 (2d Cir. 2014) (holding that officer had reasonable suspicion of criminal activity based on his observation of two cellular phones and air freshener in defendant's car, along with defendant's nervousness and difficulty answering questions about his travel plans); United States v. Valenzuela-Rojo, 139 F. Supp. 3d 1252, 1260 (D. Kan. 2015) (listing presence of TracFones and air freshener in car as factors supporting reasonable suspicion).

¶ 34. An individual's apparent attempts to conceal something from an officer also can contribute to an officer's reasonable suspicion. Manning, 2015 VT 124, ¶ 18. The video from both stops shows that immediately after stopping his vehicle, defendant repeatedly leaned over far to his right and almost disappeared from sight, as if he were hiding something underneath his seat.

11

Such "furtive movements," made in the presence of police, can support a finding of reasonable suspicion. Id. ¶ 19 (citing United States v. Edmonds, 240 F.3d 55, 61 (D.C. Cir. 2001)).

¶ 35. Similarly, excessive nervousness can support reasonable suspicion when coupled with other factors. See Cunningham, 2008 VT 43, ¶ 24. The trooper in this case testified that defendant exhibited an unusual degree of nervousness during the first stop, which did not abate when the trooper gave him a warning and sent him on his way. He continued to act highly nervous throughout their second encounter. Although it is not highly probative, defendant's nervousness is relevant to the calculus. Id.

¶ 36. We agree with the trial court that the apparent presence of marijuana in defendant's car, in conjunction with other factors, also supported reasonable suspicion. See Weisler, 2011 VT 96, ¶ 40 ("Based on his initial observation of what he believed, in his experience, to be marijuana flakes, the investigating officer had at least a reasonable suspicion of wrongdoing sufficient to justify [the defendant's] initial brief detention in the cruiser.").[1] Defendant challenges the trial court's finding that while speaking to defendant during the second stop, the trooper observed small green plant flakes around the center console that he believed to be marijuana, which he did not take into evidence. This finding was not clearly erroneous. The trooper was trained and experienced in identifying marijuana. He described the alleged marijuana flakes in his affidavit of probable cause and testified regarding his observation during the suppression hearing. The court plainly found the trooper to be credible. Although it is true that the trooper did not collect the plant material and did not mention the marijuana flakes to defendant during their conversation, these facts do not provide a sufficient basis for rejecting the court's finding. See Mara, 2009 VT 96A,

---

[1] Defendant argued below that that the 2013 enactment of 18 V.S.A. § 4230a, which makes possession of small amounts of marijuana a civil violation, means that the presence of small amounts of marijuana alone is now insufficient to support reasonable suspicion. We need not address this argument, as defendant has not briefed it on appeal. We note, however, that § 4230a(c)(2) specifically states: "This section is not intended to affect the search and seizure laws afforded to duly authorized law enforcement officers under the laws of this State."

¶ 6; Pion v. Bean, 2003 VT 79, ¶ 15, 176 Vt. 1, 833 A.2d 1248 ("We will not disturb the trial court's findings of fact unless they are clearly erroneous, despite inconsistencies or substantial evidence to the contrary.").

¶ 37. Defendant correctly argues that the information provided to the trooper by the Newport police officer about his alleged drug activity, which the Newport officer received from an unnamed source eight months earlier, was, by itself, insufficiently probative to support a reasonable suspicion of wrongdoing. See Cunningham, 2008 VT 43, ¶ 22 (holding that uncorroborated information in CAD system from unnamed sources that defendant had prior involvement with drugs was insufficient to provide reasonable suspicion of drug activity). In Cunningham, the information from the CAD system was the only indication of any involvement with drugs by defendant Cunningham. As we subsequently noted in Manning, "[i]t is clear that the officers in Cunningham . . . were acting on little more than a hunch." 2015 VT 124, ¶ 22. Here, on the other hand, defendant's unusual reason for travel, actions inconsistent with his stated itinerary, travel to and from a drug source city, excessive nervousness and furtive movements, and the presence of marijuana and drug courier paraphernalia in the car, viewed by a trooper familiar with drug trafficking practices, provide a sufficient basis for a reasonable suspicion of drug activity. The information provided by the Newport officer was just part of the other factors supporting the trooper's reasonable suspicion that defendant was engaged in drug-related activity. It was therefore permissible for the trooper to extend the stop to investigate this suspicion. See State v. Winters, 2015 VT 116, ¶ 14, 200 Vt. 296, 131 A.3d 186 ("If, during the course of an investigative stop, an officer gathers additional information providing reasonable suspicion that some other criminal activity is afoot, the officer may extend the detention to investigate that activity.").

¶ 38. Defendant next claims that the trooper impermissibly extended the bounds of an investigative stop by subjecting him to overly intrusive interrogation within the cruiser, thereby

rendering his subsequent consents to search the car tainted and ineffective. When an officer detains a person based on a reasonable suspicion of criminal activity, the detention must take no longer than necessary and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983). Defendant appears to argue that both the length and form of the detention were impermissibly intrusive.

¶ 39. We disagree that the detention in the cruiser was overly long or intrusive. The cruiser video shows that approximately five minutes elapsed from the time that defendant entered the cruiser to the time that he gave consent to search his vehicle. Defendant sat in the front passenger seat of the cruiser. While the trooper wrote him a warning, defendant and the trooper talked about the engagement rings defendant had seen, his price range, his hope that his girlfriend was "the one," his daughter, his relationship with his daughter's mother, the possibility of traveling to Canada to look for a ring, whether one needs a passport to travel to Canada, defendant's job, and a work-related injury. Four minutes after defendant entered the cruiser, there was the following exchange:

> Trooper: Do you use any drugs at all?
>
> Defendant: Nothing.
>
> Trooper: Would you mind rolling up your sleeves for me? Show me your arms? Okay. Not snorting anything?
>
> Defendant: Nothing.
>
> Trooper: Can you tilt your head back for me? Did you go down to Holyoke to pick up any dope?
>
> Defendant: No, I swear on my daughter. I went down to get an engagement ring for my girlfriend.
>
> Trooper: Okay.
>
> Defendant: I mean, you patted me down, I don't use.

14

The trooper watched defendant as he rolled up his sleeves and tilted his head back, but did not lean toward defendant or touch him. This exchange took about twenty seconds. The trooper then asked if defendant would allow him to search defendant's vehicle, and defendant consented. At this point, defendant had been detained for a total of less than eight minutes. This was not an unreasonable amount of time for the trooper to investigate his reasonable suspicion that defendant was engaged in drug-related activity. Indeed, the questioning did not measurably prolong the traffic stop for speeding. See Arizona v. Johnson, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").

¶ 40. Moreover, the trooper's questioning about defendant's drug use was not overly intrusive, given that he had reason to suspect that defendant was involved in drug-related activity. Cf. Winters, 2015 VT 116, ¶ 27 (holding that suppression was required where officer's pointed questions about defendant's involvement in drug trade converted consensual encounter into Terry stop for which reasonable suspicion was required, and officer had no information to support reasonable suspicion of current illegal activity by defendant). We have held that if an officer has reasonable suspicion that an individual is engaged in illegal activity, "the initial encounter can 'escalat[e],' with 'each inquiry by the officer le[ading] to further evidence justifying further restraints on defendant's freedom until probable cause exist[s] to arrest defendant and process him" for the suspected crime. State v. McGuigan, 2008 VT 111, ¶ 8, 184 Vt. 441, 965 A.2d 511 (quoting State v. Gray, 150 Vt. 184, 189, 552 A.2d 1190, 193 (1988)). Defendant's subsequent consents were not tainted by his detention in the cruiser.[2]

---

[2] In reaching this conclusion, we do not intend to condone the officer's request to look up defendant's nose. A warrantless intrusion into an area of the body that is hidden from view ordinarily requires a clear indication that evidence of a crime will be found in that location. See State v. Towne, 158 Vt. 607, 621, 615 A.2d 484, 492 (1992) ("[A] police officer may not make a warrantless search 'beyond the body's surface' absent a clear indication that evidence of a crime

¶ 41. We next consider defendant's argument that he withdrew his consent to search the vehicle before the drug sniffing dog was brought to the vehicle. An individual may limit or revoke his or her consent to a warrantless search. See Florida v. Jimeno, 500 U.S. 248, 252 (1991); State v. Grega, 168 Vt. 363, 373, 721 A.2d 445, 453 (1998). Although no magic words are required, it is generally agreed that "[a] defendant must make an unequivocal act or statement to indicate that consent is being withdrawn." United States v. Parker, 412 F.3d 1000, 1002 (8th Cir. 2005); see also United States v. $304,980.00 in U.S. Currency, 732 F.3d 812, 820 (7th Cir. 2013); United States v. Gregoire, 425 F.3d 872, 881 (10th Cir. 2005); State v. Milos, 882 N.W.2d 696, 704 (Neb. 2016); State v. Wantland, 848 N.W.2d 810, 818 (Wis. 2014).

¶ 42. We find no such unequivocal act or statement of withdrawal here. Defendant's initial reluctance to have the dog search the car was not a clear revocation of consent. See Gregoire, 425 F.3d at 881 (affirming trial court's determination that defendant's statements to officer conducting search that he was planning to be home and questioning legality of search were ambiguous and did not constitute withdrawal of consent); $304,980.00 in U.S. Currency, 732 F.3d at 820 ("[P]olice officers do not act unreasonably by failing to halt their search every time a consenting suspect equivocates."). Even if defendant's statements that he "[did]n't see the need" and that "[he]'d rather just go home" could be construed as a revocation of consent, he subsequently renewed his consent when the trooper specifically asked him if they could run the dog through the car, and he responded that they could.

¶ 43. For this reason, we also reject defendant's argument that the search by the K-9 officer exceeded the scope of the consent form he signed. There was no doubt at the point that

_____

will be found." (quoting Schmerber v. California, 384 U.S. 757, 769-70 (1966))). Although the officer in this case had reasonable suspicion that defendant was involved in some form of drug-related activity—likely trafficking—there was no specific indication that any evidence would be found in defendant's nose. However, because the evidence challenged in this case did not result from the officer's request, the request does not affect our ultimate conclusion that the trial court properly denied the motion to suppress.

defendant renewed his consent that another officer besides the trooper would be conducting the dog sniff. Defendant made no indication that he did not want another officer to go through his car. In any event, many courts have held that a consent search may not "be qualified by the number of officers allowed to search." United States v. Rubio, 727 F.2d 786, 797 (9th Cir. 1983) (explaining that "[o]nce consent has been obtained from one with authority to give it, any expectation of privacy has been lost."); see also United States v. Betts, 16 F.3d 748, 755 (7th Cir. 1994) ("[T]here was no Fourth Amendment interest violated by the participation of officers other than those listed on the consent form."), abrogated on other grounds by United States v. Mills, 122 F.3d 346 (7th Cir. 1997); accord Wildauer v. Frederick Cnty., 993 F.2d 369, 372 (4th Cir. 1993).

¶ 44. Finally, defendant claims that the trial court erred by denying his renewed motion to suppress prior to trial without permitting him to present additional evidence, namely, that his cell phone was not a prepaid TracFone. Defendant never mentioned any new evidence to the trial court, either at trial or in its post-trial motion for a new trial. We accordingly decline to address this argument on appeal. See State v. Morse, 2014 VT 84, ¶ 20, 197 Vt. 495, 106 A.3d 902 (explaining that issues not raised before trial court are waived on appeal). We note, however, that the trial court has broad discretion in deciding whether to reopen the evidence and reconsider a pretrial suppression motion, and we have stated that "trial court reconsideration of pretrial suppression rulings should be the exception, not the rule." State v. Simoneau, 2003 VT 83, ¶ 37, 176 Vt. 15, 833 A.2d 1280.

Affirmed.

FOR THE COURT:

_____

Associate Justice

17